UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOHN DOE,

                        Plaintiff,

                                            6:21-CV-0436 (GTS/CFH)

v.

HAMILTON COLLEGE; and
HAMILTON COLLEGE BOARD OF
TRUSTEES,

                        Defendants.
_____

APPEARANCES:                                OF COUNSEL:

NESENOFF & MILTENBERG, LLP         ANDREW MILTENBERG, ESQ.
  Counsel for Plaintiff                   TARA J. DAVIS, ESQ.
 363 Seventh Avenue – 5th Floor       PHILIP A. BYLER, ESQ.
 New York, NY 10001

BOND SCHOENECK & KING, PLLC       JONATHAN B. FELLOWS, ESQ.
  Counsel for Defendants             SUZANNE M. MESSER, ESQ.
 One Lincoln Center
 Syracuse, NY 13202

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

       Currently before the Court, in this Title IX gender discrimination action filed by John

Doe ("Plaintiff") against Hamilton College and the Hamilton College Board of Trustees

("Defendants"), is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56(c).

(Dkt. No. 26.)  For the reasons stated below, Defendant's motion is granted, and Plaintiff's

Complaint is dismissed.

**I.**      **RELEVANT BACKGROUND**

      **A.**     **Plaintiff's Complaint and Relevant Procedural Background**

Plaintiff filed his Complaint against Defendants on April 15, 2021.  (Dkt. No. 1 [Plf.'s Comp.].)  Generally, liberally construed, Plaintiff's Complaint asserts the following four claims: (1) a claim that Defendants violated Title IX of the Education Amendment of 1972, 20 U.S.C. § 1681 *et seq.*, by reaching an erroneous outcome when they found him guilty of sexual assault given that (a) there are particular facts that sufficiently cast an articulable doubt on the accuracy of the outcome of the disciplinary proceeding, and (b) there is a causal connection between the flawed outcome and gender bias; (2) a claim that Defendants breached their contract with Plaintiff by (a) failing to provide a fair process in the investigation and adjudication of the sexual assault allegations against him, (b) depriving him of meaningful access to information and evidence, (c) depriving him of the ability to propose questions to witnesses, (d) failing to inform him of a disciplinary board's report and recommended sanction, and (e) allowing his Roe's representative to speak and advocate on her behalf during an investigative interview despite the fact that Defendants' sexual misconduct policy prohibited such conduct; (3) a claim that Defendants breached their contract with Plaintiff, specifically their duties of good faith and to avoid "denial of basic fairness/arbitrary and capricious decision making[,]" by (a) depriving him of the right to an impartial disciplinary panel, (b) depriving him of the right to question his accuser, and (c) depriving him of the protection of a higher standard of proof; and (4) a claim that Defendant violated the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, by discriminating against him on the basis of his sex.  (*See generally id.*)

Defendants filed their Answer to the Complaint on June 4, 2021.  (Dkt. No. 10.)  The parties participated in a mandatory mediation session on September 27, 2021, but the case did not settle.  (Dkt. No. 18.)  Defendants filed a motion for summary judgment on September 9, 2022.  (Dkt. No. 26.)  Plaintiff filed a response in opposition to Defendants' motion on October

21, 2022.  (Dkt. No. 35.)  Defendants filed a reply to Plaintiff's response on November 4, 2022. (Dkt. No. 38.)

Familiarity with the above-discussed claims and the factual allegations supporting them in Plaintiff's Complaint, and the relevant procedural history, is assumed in this Decision and Order, which is intended primarily for review by the parties.

###    B.    Undisputed Material Facts

Before reciting the material facts of this case, the Court finds it appropriate to address a problem that has plagued Plaintiff's response to Defendants' Statement of Material Facts.  On numerous occasions, although Plaintiff expressly admits the facts asserted by Defendants, he then follows those admissions with commentary for the Court's consideration (without an express denial). (*See, e.g.*, Dkt. No. 35, Attach. 48, at ¶¶ 3, 5, 7-9, 13, 49, 59, 68, 69, 94, 97, 104, 105, 109, 115, 116, 123, 141, 159.)  Moreover, on numerous occasions, Plaintiff expressly admits some of the facts asserted by Defendants, but then he attempts to deny portions of those same admitted facts without adequately specifying or addressing the portions that he denies (or, more often, he denies mischaracterized or unasserted facts), and he generally follows those attempted partial denials with similar impermissible commentary or citations to record evidence that either does not support the partial denial or is inadmissible in opposing a motion for summary judgment (such as his own unverified Complaint).  (*See, e.g.*, Dkt. No. 35, Attach. 48, at ¶¶ 14, 18, 20, 25, 26, 71, 73, 74, 75, 126.)   This failure to expressly deny each of Defendant's factual assertions without a specific citation to admissible record evidence supporting the denial violates Local Rule 56.1(b) of the District's Local Rules of Practice.  Moreover, "[t]his [insertion

of commentary] is impermissible,[1] regardless of whether the commentary is intended to assert a related fact,[2] place in context or 'spin' the asserted fact,[3] or deny a perceived implication of an asserted fact.[4]" *Yennard v. Boces*, 353 F. Supp. 3d 194, 196–97 (N.D.N.Y. 2019) (Suddaby, C.J.).  Simply stated, Plaintiff's noncompliance with Local Rule 56.1(b) has frustrated the Court's determination of the undisputed material facts of this motion.

Nevertheless, the Court has carefully considered Defendants' Statement of Material Facts, Plaintiff's Responses thereto, and Plaintiff's Statement of Additional Material Facts in Dispute.  Unless otherwise noted, the following material facts were asserted and supported by

---

[1]    *See CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) ("[T]he Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed.'"); *Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) ("[T]he statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit.' ").

[2]    *See Maioriello v. New York State Office for People With Developmental Disabilities*, 272 F.Supp.3d 307, 311 (N.D.N.Y. 2017) ("[T]hroughout Plaintiff's Rule 7.1 Response, she 'admits' many of the facts asserted by Defendants in their Rule 7.1 Statement but then includes additional facts and/or legal argument in those responses.... Where this occurs, the Court will deem those facts admitted and disregard the additional factual assertions and/or argument that Plaintiff provides in her responses."); *Baity v. Kralik*, 51 F.Supp.3d 414, 417 (S.D.N.Y. 2014) (holding that plaintiff's response to defendant's Rule 56.1 Statement failed to comply with the rule because "counsel neither admits nor denies a particular fact, but instead responds with equivocal statements such as: 'Admit, but defendant omits the balance of plaintiff's testimony' ").

[3]    *See Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make").

[4]    *See Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).

accurate citations by Defendants in their Statement of Material Facts and expressly admitted by

Plaintiff, or denied without a supporting accurate record citation, in his Response thereto.

(*Compare* Dkt. No. 26, Attach. 37 [Defs.' Statement] *with* Dkt. No. 35, Attach. 48 [Plf.'s.

Response and Statement of Additional Material Facts in Dispute].)

## The Parties

1.      Plaintiff, John Doe, is a former student at Hamilton College.

2.      Hamilton College is a private liberal arts college located in Clinton, NY.

## The College's Sexual Misconduct Policy

3.      During the 2019-20 academic year, Defendants maintained a Sexual Misconduct

Policy (the "Policy") to address sexual misconduct complaints involving the students, faculty,

and staff (the "community") of Hamilton College.[5]

4.      The Policy defined conduct that constituted sexual misconduct at Hamilton

College.

5.      The Policy provided procedures through which Hamilton College responded to

claims of sexual misconduct.[6]

---

[5]      Plaintiff admits this fact, but then provides impermissible commentary (see this section's prefatory remarks above). (Dkt. No. 35, Attach. 48, at ¶ 3.)  Specifically, Plaintiff contends that one of the record citations put forth by Defendants, specifically ¶ 9 of the Declaration of Julie Green (Dkt. No. 26, Attach. 32), does not support the asserted fact.  Although the Court finds that Plaintiff is correct, Defendants' other two record citations do support the asserted fact.  (Dkt. No. 26, Attach. 6, at ¶ 9; Dkt. No. 26, Attach. 25, at ¶ 8.)  Therefore, the Court deems the fact admitted.

[6]      Unless otherwise noted, the following undisputed material facts in this section (Part I.B.1.a.), which relate to the general process and procedure Hamilton College used to investigate and adjudicate sexual misconduct complaints, are all pursuant to the Policy that was in effect during the 2019-20 academic year.  (Dkt. No. 26, Attach. 7.)

6.      The Policy described resources available to individuals who were involved in a sexual misconduct proceeding.[7]

7.      During the 2019-20 academic year, Catherine Berryman was the Director of Community Standards and Title IX Coordinator at Hamilton College.[8]

8.      The Director of Community Standards was responsible for overseeing issues that arose under the Policy, the Harassment and Discrimination Policy, and the Student Code of Conduct, and for coordinating the activities of the HSMB[9] and the Judicial Board.

9.      The Title IX Coordinator was responsible for ensuring Hamilton College's compliance with federal and state rules concerning sexual misconduct on campus, including any

---

[7]      Plaintiff denies this asserted fact, but he fails to provide sufficient record evidence to support that denial. (Dkt. No. 35, Attach. 48, at ¶ 6.) In support of his denial, Plaintiff asserts that the resources listed in the Policy "cater" toward victims of sexual assault, e.g., YWCA Rape Crisis Services, SANE services. (*See generally* Dkt. No. 26, Attach. 7.) Setting aside the non-responsiveness of confusing whether a policy is "available" to someone and whether it "caters" to someone, the Policy clearly describes resources that were available to all students. Nothing in the Policy explicitly states that support resources were meant only for complainants and not for respondents. (*Id.*) For example, according to the Policy, the Counseling Center, the whole description of which Plaintiff neglects to cite, "is a confidential resource, available 24-hours a day/7 days a week, whose staff can provide students emotional support and information about reporting options." (*Id.*) Nothing in this description suggests that respondents in sexual misconduct cases could not seek help there, especially the part regarding "emotional support," which is neutral and directed to both complainants and respondents. Likewise, according to the Policy, the Chaplaincy could provide "pastoral care" and "emotional support," along with "information about reporting options." Nothing in the description suggests that respondents in a sexual misconduct case were unable to contact the Chaplaincy to discuss their religious or emotional needs after being accused under the Policy.

[8]      Plaintiff admits this fact, but then provides impermissible commentary stating that Berryman served as Director of Community Standards, and that part of her responsibilities in that role included serving as the Title IX Coordinator. (Dkt. No. 35, Attach. 48, at ¶ 7.) Even if Plaintiff's assertion were correct, nothing in the assertion controverts the above-asserted fact.

[9]      Harassment and Sexual Misconduct Board (HSMB).

reporting requirements, and when a complaint under the Policy is received, ensuring the complaint is resolved pursuant to the Policy's processes.[10]

10.    During the 2019-20 academic year, Hamilton College maintained a Harassment and Sexual Misconduct Board ("HSMB"), which was responsible for ensuring that the Hamilton College community complied with the Policy.[11]

11.    The HSMB consisted of faculty members and a Chair, who was normally a tenured faculty member of Hamilton College and was appointed into the role by the Dean of Faculty.[12]

12.    During the 2019-20 academic year, Stephen Orvis served as Chair of the HSMB.

13.    The HSMB Chair was responsible for meeting with the complainant and respondent at the outset of a dispute resolution procedure, along with the Title IX Coordinator, who helped ensure compliance with the Policy throughout the process.

14.    The HSMB Chair was also responsible for scheduling Review Panel meetings, preparing the Review Panel Findings Report, preparing the Review Panel Sanction

---

[10]    Plaintiff admits the asserted fact, but then attempts to add additional commentary (as discussed in this section's prefatory remarks).  (Dkt. No. 35, Attach. 48, at ¶ 59.)

[11]    Plaintiff admits this fact to the extent that it appears in the Declaration of Stephen Orvis. (Dkt. No. 26, Attach. 26.)  Plaintiff then appears to impermissibly deny the fact, without explicitly stating so, by quoting (from an internet URL not in the record) a description of the HSMB as "a group of faculty and staff whose purpose is to help ensure that members of the College community can live and work free from harassment and/or sexual misconduct.").  (Dkt. No. 35, Attach. 48, at ¶ 8.)  Because this evidence does not controvert the above-stated fact, the Court finds any denial by Plaintiff ineffective.

[12]    Plaintiff admits this fact, but then provides impermissible commentary; specifically, Plaintiff adds that the Chair of the HSMB is "normally" a tenured faculty member, but not necessarily a tenured faculty member.  (Dkt. No. 26, Attach. 7, at 15.)  Although the Court need not modify the asserted fact because Plaintiff admitted to it, the Court has modified the fact to more closely reflect the Policy, which both parties cite.

Recommendation, and ensuring the Review Panel's process and deliberations complied with the Policy.

## The Policy's Investigation and Review Procedures

15.     Pursuant to the Policy, during the 2019-20 academic year, Hamilton College used an investigator-model procedure to address complaints of sexual misconduct.

16.     When a student made a complaint to Hamilton College concerning sexual misconduct and asked to engage in a formal resolution process, the Title IX Coordinator would evaluate the complaint to determine whether the alleged conduct fell within the parameters of the Policy, and, if so, the Coordinator would move the complaint through the formal resolution process enumerated in the Policy.[13]

17.     Once a formal resolution process commenced, the Title IX Coordinator would meet with the complainant and respondent separately to explain the investigative procedures, provide both parties with the Notice of Complaint and a copy of the Policy, and explain their rights under the Policy.[14]

18.     The Title IX Coordinator would prepare the written Notice of Complaint, which would include information like the date the alleged incident occurred, the conduct being alleged, the parties involved, and the potential Policy violations being investigated.

---

[13]     Plaintiff admits this fact, but then adds additional impermissible commentary.  (Dkt. No. 35, Attach. 48, at ¶ 13.)  The detail Plaintiff adds does not controvert the fact that Defendants asserted.

[14]     Plaintiff admits this fact, but then denies that he was provided with a physical copy of the Notice of Complaint during his initial meeting with Berryman; instead, he asserts, he had the complaint read to him.  (Dkt. No. 35, Attach. 48, at ¶ 14.)  Such a denial is ineffective.  The asserted fact says nothing of *how* the Notice of Complaint was provided to the parties.

19.     The parties in a matter involving sexual assault had a right to an advisor of their own choice and to have that advisor be present at any interview or other meeting related to the investigation and resolution process.

20.     An advisor could advise the parties, but he or she was not permitted to act as a speaking advocate.

21.     A two-person investigation team would interview the complainant and respondent and gather evidence, which could include interviewing witnesses recommended by the parties; however, such interviews and other investigative methods would be done "at the sole discretion of the Investigation Team in the context of impartial treatment of both parties."[15]

22.     The Title IX Coordinator selected the members of the investigation team.

23.     The members of the investigative team did not make recommendations with respect to responsibility for violating the Policy.[16]

24.     The investigation team was authorized to contact any relevant people and to access any available records not otherwise prohibited by legal protections of privilege or confidentiality.

---

[15]     Plaintiff admits in part and denies in part this asserted fact.  (Dkt. No. 35, Attach. 48, at ¶ 18.)  In support of his partial denial, Plaintiff asserts that the Policy states that interviews and investigative methods are recommended by the parties, but ultimately done at the "sole discretion" of the investigation team.  According to the record evidence cited, the Court finds that Plaintiff is correct: who to interview and how to investigate were left up to the investigation team's discretion.  The language of the asserted fact in this Decision and Order reflects the Policy's language.

[16]     Plaintiff denies that members of the investigation team "were not decision-makers" (as stated in Defendants' original formulation of the above-stated fact) because they made discretionary decisions regarding who to interview and how to investigate.  (Dkt. No. 35, Attach. 48, at ¶ 20.)  Although the original formulation appears intended to refer only to decisions made regarding whether the Policy has been violated, it does not expressly so state: as a result, the Court has omitted the phrase "were not decision-makers."

25.    The investigation team was responsible for the custody of any evidence collected during an investigation.

26.    A person interviewed by the investigation team would be provided with a transcript of the interview to make revisions and clarifications, if needed, which were then included as appendices to the investigation report.

27.    After the completion of an investigation, the investigation team prepared a report, which the complainant and respondent had the opportunity to review and comment on before it was finalized.

28.    Pursuant to the Policy, "Both parties will have an opportunity to respond to [the investigation report], in writing, within seven days.  If at any stage following submission of these responses new and relevant information is gathered, it will be shared with the Complainant and Respondent . . . .  The Complainant and Respondent may request to see the other party's written responses."[17]

29.    Also pursuant to the Policy, "Following the initial seven day review period by the Complainant and Respondent and any subsequent responses and gathering of new information, the Investigation Team will complete their final report and, within seven days, meet with the Chair and Title IX Coordinator to deliver that final written report, which will include relevant facts, all relevant investigation materials, Complainant and Respondent statements and responses to the other's statement, and any additional information gathered.  The Title IX Coordinator will

---

[17]    Plaintiff admits in part and denies in part the fact Defendants assert.  (*Compare* Dkt No. 26, Attach. 37, at ¶ 25 *with* Dkt. No. 35, Attach. 48, at ¶ 25.)  The crux of Plaintiff's partial denial is that the fact asserted does not accurately reflect the language of the Policy.  As a result, the Court quotes from the Policy.  (*Id.*)

notify the Complainant and Respondent of the completion of the final Investigation team report and make arrangement for each to review."[18]

30.     After the investigation team finalized its report, the Title IX Coordinator would convene a review panel consisting of three voting members of the HSMB, and one non-voting HSMB Chair.

31.     The review panel was responsible for reviewing the investigation report and associated evidence, then determining whether, by a preponderance of the evidence, the Policy had been violated.

32.     The parties would have an opportunity to meet with the review panel prior to its deliberations.

33.     The review panel would prepare a written summary of its determination, including any findings of fact and rationale for its determination.

34.     If the review panel determined that the respondent violated the Policy, then the parties would have the option of submitting impact statements for the review panel's consideration when considering a sanction.

35.     After a review of the impact statements, the evidentiary record, and relevant precedent, the review panel would issue a sanction recommendation to a senior staff member of Hamilton College.

36.     The senior staff member was responsible for imposing the sanction upon a student-respondent found responsible for violating the Policy, communicating the sanction to the complainant and respondent, and explaining the appeals process to the respondent.

---

[18]     Plaintiff admits in part and denies in part the fact Defendants assert. (*Compare* Dkt No. 26, Attach. 37, at ¶ 26 *with* Dkt. No. 35 Attach. 48, at ¶ 26.)  For the same reasons stated in footnote 16 of this Decision and Order (see above), the Court quotes directly from the Policy.

37.     During the 2019-20 academic year, the senior staff member for complaints involving students was Vice President and Dean of Students Terry Martinez.

38.     Potential sanctions were listed in the Policy and included a range from a warning to expulsion.

39.     Pursuant to the Policy, students found responsible for a non-consensual sexual act (penetration and/or oral contact) should have expected, normally, to be suspended or expelled from Hamilton College.

40.     Although the Policy states that "[i]ndividuals found responsible for a Non-consensual Sexual Act (penetration and/or oral contact) should normally expect suspension or expulsion from the College," the typical sanction imposed by Hamilton College in instances where a respondent is found responsible for committing a non-consensual sexual act is expulsion.[19]

41.     When reaching a decision on an appropriate sanction, the senior staff member would consider the investigation report, the HSMB review panel findings report, and the review panel sanction recommendation, and the senior staff member could meet with the parties as well.

**The Policy's Appeal Procedures**

42.     Both complainants and respondents could request an appeal from the review panel findings report and the sanction to Hamilton College's Appeals Board.

---

[19]     Plaintiff denies the second clause in the above-stated fact (i.e., the clause regarding the "typical sanction imposed"), citing the portion of the Policy stating the first clause in the above-stated fact (i.e., the clause regarding what individuals should "normally expect"). (Dkt. No. 35, Attach. 48, at ¶ 37.) Because both facts may be true, and because Defendants cite to record evidence that supports the second fact, the Court has inserted the first fact for the sake of accuracy.

43.    The Appeals Board was tasked with ascertaining that the proceedings conducted by the Honor Court, the HSMB, and the Judicial Board were conducted fairly, in accordance with applicable procedures, and without undue bias.

44.    The Appeals Board was comprised of three faculty members and two students, but the students did not participate in sexual misconduct appeals.

45.    The Academic Council nominated the faculty members for the Appeals Board, then the faculty at large voted on the nominations and, if elected, the members served a three-year term.

46.    The Chair of the Appeals Board was a faculty member designated by the Dean of Faculty.

47.    During the 2019-20 academic year, the Chair of the Appeals Board was Brian Collett.

48.    The Chair of the Appeals Board was responsible for scheduling meetings, inviting appropriate parties to respond to an appeal, drafting Appeals Board decisions, and fulfilling the other duties applicable to all Appeals Board members.

49.    The Policy provided that students subject to disciplinary action following a proceeding before the Review Panel could appeal the decision and/or sanction within seven days of being informed, in writing, of the Review Panel's decision.

50.    The student's appeal needed to be made in writing, directed to the Chair of the Appeals Board, state in detail the reasons for the appeal, and identify the grounds upon which the appeal was based.

51.    Pursuant to the Policy, a student could appeal a finding and sanction in a sexual misconduct case on three grounds: (1) there was a sanction inconsistent with the severity of the

violation or with the stated community standards and precedents; (2) there were procedural

error(s) that had a material impact on the fairness of the process; and/or (3) there was discovery

of previously unavailable relevant information that could significantly impact the result of the

Review Panel's or senior staff member's determination.

     52.     Upon receipt of an appeal, the Appeals Board Chair would invite the HSMB

Chair and/or the senior staff member to respond within seven days.

     53.     The non-appealing party was invited to provide a response within seven days.[20]

     54.     The Title IX Coordinator would provide the Appeals Board with the investigation

report and any other materials made available to the Review Panel.

     55.     Pursuant to the Policy, "Within seven days of an appeal being filed, the Chair of

the Appeals Board will schedule a meeting for consideration and disposition of the appeal."; this

meeting involved a determination of whether the appeal fell within the permissible grounds for

appeal and, if it did, a deliberation of that appeal).[21]

     56.     The Appeals Board was not to substitute its own judgment for that of the original

decision-making body, but rather to review the procedures by which the original decision was

reached.

---

[20]     Plaintiff expressly admits the asserted fact, but then improperly asserts another fact (specifically, that the Policy does not "specify" the asserted fact). (Dkt. No. 35, Attach. 48, at ¶ 49.) In any event, the asserted fact says nothing of what the Policy does or does not "specify."

[21]     Plaintiff denies Defendants' originally asserted fact (which spoke of the Appeals Board "conven[ing]" two times). (*Compare* Dkt. No. 26, Attach. 37, at ¶ 51 *with* Dkt. No. 35, Attach. 48, at ¶ 51.) In support of this denial, Plaintiff cites the Policy (which expressly speaks of the Appeals Board scheduling only a "meeting"). (Dkt. No. 26, Attach. 7, at 32].) Because both facts may be true, and because Defendants cite to record evidence that supports their originally asserted fact, the Court has amended Defendants' originally asserted fact, for the sake of accuracy.

57.     The Appeals Board could uphold the original decision, remand the case to the

senior staff member, or, in extraordinary cases, remand the matter to an *ad hoc* review panel

composed of members of the HSMB not previously involved in the matter.

58.     Pursuant to the Policy, "The Appeals Panel will provide the parties, the Senior

Staff Member, and the Chair of the [HSMB] written notice of its decision, including grounds for

the decision, normally within seven days of its meeting."[22]

59.     Decisions of the Appeals Board are final.

**The Roe-Doe Investigation**

60.     On October 1, 2019, Jane Roe e-mailed Berryman and asked to meet with her.

61.     On October 1, 2019, Berryman met with Roe, who (according to Berryman's

notes) informed Berryman that she (Roe) had been intoxicated when she met a person with

whom she had sexual contact and asked for help setting up an appointment at the counseling

center.[23]

---

[22]     Plaintiff denies the asserted fact, but then proceeds to reiterate Defendants' assertion, only with greater detail.  (*Compare* Dkt No. 26, Attach. 37, at ¶ 54 *with* Dkt. No. 35, Attach. 48, at ¶ 54.)  Both cite the same part of the Policy.  (*Id.*)  As a result, the Court quotes directly from the Policy and deems the modified fact admitted.

[23]     Plaintiff admits in part and denies in part the asserted fact. (Dkt. No. 35, Attach. 48, at ¶ 65.)  However, the record evidence cited in support of that partial denial does not actually controvert the fact asserted.  (Dkt. No. 35, Attach. 48, at ¶ 65.)  More specifically, Plaintiff asserts that, at her deposition, Berryman could not recall what Roe had told her during the October 1 meeting; thus, Plaintiff asserts, there exists a disputed material fact.  Granted, generally, a post-deposition declaration may not contradict the declarant's deposition testimony.  Moreover, here, Berryman could not recall at her deposition (approximately two and one-half years after the meeting in question) what was discussed in the meeting.  However, that failure to recall in no way contradicts Berryman's reliance on her notes from that meeting.  (Dkt. No. 26, Attach. 6, at ¶ 27 [Berryman Decl., stating "According to notes I took during the meeting . . ."].)  Indeed, Plaintiff expressly admitted "what Berryman's supposed contemporaneous notes state."  (Dkt. No. 35, Attach. 48, at ¶ 65.)

62.     During the October 1 meeting, Berryman provided Roe with the options and procedures available to Roe under the Policy if she wished to make a formal complaint, and in response, Roe advised that she wanted to think about her options.

63.     On October 3, 2019, Roe contacted Berryman and informed Berryman that she wanted to file a formal complaint against Doe.

64.     During the October 3 meeting, Roe formally identified John Doe by name and provided some other detail.[24]

65.     On October 7, 2019, Roe, Berryman, and Orvis met to discuss the details of the incident between Roe and Doe that occurred on September 29, 2019.[25]

66.     During the October 7 meeting, Roe told Berryman and Orvis the following regarding the incident in question: (1) she drank "a lot" at various places on and off-campus; (2) she left an off-campus bar, "VT" (presumably the Village Tavern, which is listed at various points throughout the record), and her roommates and freshman orientation leader got her on to

---

[24]     Plaintiff admits this fact.  (*Compare* Dkt. No. 26, Attach. 37, at ¶ 68 *with* Dkt. No. 35, Attach. 48, at ¶ 68.)  However, Plaintiff then asserts that ¶ 12 of the Declaration of Stephen Orvis (Dkt. No. 26, Attach. 6), one of the record citations cited by Defendants, does not support this fact.  As an initial matter, because Plaintiff admitted the fact, what follows (in his response) is impermissible commentary and the Court need not consider it (see this section's prefatory remarks above).  Nevertheless, the Court does note that Plaintiff is correct: ¶ 12 of the Declaration of Stephen Orvis does not state that Roe identified John Doe during her October 3 meeting.  Defendants' other record citation, however, does support their assertion.  Therefore, the Court deems the fact admitted.

[25]     Plaintiff admits this fact. (Dkt. No. 26, Attach. 37, at ¶ 69; Dkt. No. 35, Attach. 48, at ¶ 69.)  However, Plaintiff asserts that one of the sources Defendants cites to support their factual assertion, ¶ 16 of the Declaration of Julia Green (Dkt. No. 26, Attach. 32), does not in fact support this assertion.  While the Court need not consider this impermissible commentary (see above), the Court does note that Plaintiff is correct: ¶ 16 of the Declaration of Julia Green addresses a different meeting.  Nevertheless, Defendants other two record citations do support their assertion, and Plaintiff admitted the fact; therefore, the Court deems the fact admitted.

"the jitney" (a public transportation service in Clinton, NY) to take her back to campus; (3) she met John Doe getting off the jitney, but otherwise does not remember the ride; (4) she and Doe went to his room; (5) she told Doe that she did not want to have sex without a condom, but she believed that he took the condom off before engaging in vaginal intercourse; (6) Doe put his fingers down her mouth and fondled her; (7) Doe had to wake her up during sex; (8) she cried during part of her sexual encounter with Doe; and (9) she had bruising on her arms and thigh and had a sore throat the next morning.[26]

67.     Berryman and Orvis came to the conclusion that Roe's allegations supported the filing of charges under the Policy of non-consensual sexual act, non-consensual sexual contact, and sexual exploitation.[27]

68.     Pursuant to the Policy, a non-consensual sexual act was defined as penetration and/or oral contact, however, slight, with any body part or object with the genital or anus of another person without affirmative consent.  Roe's allegations supported the filing of two charges of non-consensual sexual acts: (1) a charge of non-consensual intercourse because Roe

---

[26]     Plaintiff admits the factual assertions contained in this paragraph, but then denies them to the extent that Berryman could not recall these details in her deposition.  (Dkt. No. 35, Attach. 48, at ¶ 71.)  As an initial matter, Plaintiff does not explicitly state which portion of Defendants' assertion he denies.  Moreover, the record evidence Plaintiff cites does not controvert the asserted fact; instead, it controverts a fact not asserted by Defendants.  Finally, Berryman's notes support the above-stated factual assertion.

[27]     Plaintiff denies Defendants' assertion that "Berryman and Orvis determined that, if true, the Roe Allegations supported [the charges]."  (*Compare* Dkt. No. 26, Attach. 37, at ¶ 72 *with* Dkt. No. 35, Attach. 48, at ¶ 72.)  Plaintiff reasons that Orvis testified during his deposition that Berryman "actually [wrote] the [notice of charge] document."  (Dkt. No. 35, Attach. 5, at 41:21-42:24.)  Plaintiff, however, takes this quote out of context, because Orvis also immediately stated that he "look[ed] it over and approve[d] [the Notice of Complaint] . . . ."  (*Id.*)  Simply stated, Orvis' post-deposition declaration does not actually controvert his deposition testimony.

alleged she did not consent to sex without a condom; and (2) a charge of non-consensual

intercourse because Roe alleged that she was too intoxicated to give affirmative consent.[28]

69.     Also pursuant to the Policy, a non-consensual sexual contact was defined as any

intentional sexual touching, however slight, either directly or through clothing, with any body

part or object without affirmative consent.  Roe's allegations supported the filing of this charge

because she alleged that Doe inserted his fingers into Roe's mouth and down her throat without

her consent.[29]

70.     Also pursuant to the Policy, sexual exploitation was defined as occurring when a

person takes non-consensual sexual advantage of another, and that behavior does not otherwise

---

[28]     Plaintiff admits the first sentence of the asserted fact, which defines a non-consensual
sexual act under the Policy.  (Dkt. No. 35, Attach. 48, at ¶ 73.)  However, he denies the
subsequent sentence, which asserts that the Roe allegations supported two charges of non-
consensual sexual acts.  (*Id.*)  Plaintiff then explains, in great depth and with record citations,
numerous pieces of purported exculpatory record evidence in an effort to prove that the alleged
incident did not occur in the way that Roe alleged.  Although the Court has carefully considered
this evidence, the evidence is not probative of the fact being asserted.  The asserted fact merely
states that the Roe allegations supported the two charges.  (Dkt No. 26, Attach. 37, at ¶ 73.)  It
does not assert that Doe actually committed those acts against Roe, the assertion that Plaintiff is
attempting to refute based on his record citations.  Indeed, all of the record evidence that Plaintiff
cites would have been uncovered only after Roe filed her complaint.  Simply stated, the record
evidence is clear that Roe alleged facts in her October meetings that plausibly supported
charging Doe with the two charges in question.  (Dkt. No. 26, Attach. 8 [letter to Roe
summarizing her allegations and notifying her that Doe was charged]; Dkt. No. 26, Attach. 9
[letter to Doe summarizing Roe's allegations and notifying him of the charges]; Dkt. No. 26,
Attach. 6, at ¶ 35 [Berryman Declaration summarizing October 7 meeting]; Dkt. No. 35, Attach.
35, at 4 [Berryman's notes from October 7 meeting].)

[29]     Plaintiff admits the first sentence of the asserted fact, which defines a non-consensual
sexual contact under the Policy.  (Dkt. No. 35, Attach. 48, at ¶ 74.)  However, he denies the
subsequent sentence, which asserts that the Roe allegations supported a charge of non-
consensual sexual contact.  (*Id.*)  For many of the same reasons as stated above in footnote 28 of
this Decision and Order, the Court deems the fact admitted because Plaintiff has not cited record
evidence that controverts the fact being asserted.  The fact being asserted is not that Doe
committed the alleged acts, but rather that the allegations asserted by Roe supported the two
charges.

constitute another form of sexual misconduct.  Roe's allegations supported the filing of this charge because she alleged that Doe penetrated her vagina without a condom, contrary to her insistence.[30]

71.    Following the October 7 meeting, Berryman prepared a notice of complaint detailing these four charges (the "Roe-Doe Complaint") and informing the parties that the College was commencing an investigation into those charges (the "Roe-Doe Investigation").

72.    On October 9, 2019, Berryman met with Roe and provided her with the Roe-Doe Complaint.

73.    On or about October 9, 2019, Berryman and Orvis met with Doe to provide him with the Roe-Doe Complaint, explain the charges to him, and provide information about the process and resources available on campus.

74.    During the October 9 meeting, Berryman and Orvis discussed, among other things, Doe's right to an advisor, encouraged Doe to take advantage of his right to an advisor, and provided Doe with a copy of the Policy.

75.    After the October 9 meeting, Doe requested recommendations from Berryman and Orvis for an advisor, and ultimately accepted their recommendation of Professor Todd Franklin.

76.    On or around October 9, 2019, Berryman issued mutual no contact orders instructing both Roe and Doe not to have any contact with one another during the pendency of the investigation.

---

[30]    Plaintiff admits the first sentence of the asserted fact, which defines a non-consensual sexual contact under the Policy.  (Dkt. No. 35, Attach. 48, at ¶ 75.)  However, he denies the subsequent sentence, which asserts that the Roe allegations supported a charge of non-consensual sexual contact.  (*Id.*)  For the same reasons as those in footnotes 28 and 29 of this Decision and Order, the Court deems the fact admitted.

77.     Pursuant to the Policy, Berryman selected two investigators to serve as the Investigation Team: Julia Green and Mark Kinne (the "Roe-Doe Investigation Team").

78.     The Roe-Doe Investigation Team received and reviewed the Roe-Doe Complaint.[31]

79.     Before conducting interview of the parties and witnesses, the Roe-Doe Investigation Team would meet for a half-hour to review an outline of questions they generally asked during interviews and add questions that the parties requested them to ask.[32]

80.     On or about October 16, 2019, Green contacted Doe by e-mail to schedule an interview with him to gather information about the Roe Allegations.

81.     In an October 16 e-mail, Green informed Doe that, during the meeting, the Roe-Doe Investigation Team would ask him to identify any sources of information (including witnesses) that may be relevant to the Roe-Doe Investigation, and she invited him to send an e-mail in advance with potential witnesses and information they may have, and included Professor Franklin as a recipient.

82.     After the October 16 e-mail, Doe sent the Roe-Doe Investigation Team a copy of a statement that he had previously prepared and provided to Professor Franklin (the "Doe Statement").

---

[31]     Plaintiff denies this asserted fact and contends that the source Defendants cite does not support it.  (Dkt. No. 35, Attach. 48, at ¶ 83.)  Plaintiff is correct; however, other record evidence supports Defendants' assertion.  (Dkt. No. 35, Attach. 4 [deposition of Mark Kinne].)  Moreover, Plaintiff denies only that Kinne received the Roe-Doe Complaint, not that he never reviewed it.

[32]     Plaintiff denies the asserted fact and selectively quotes from Kinne's deposition in support of that denial.  (Dkt. No. 35, Attach. 48, at ¶ 84.)  Plaintiff's denial is ineffective because the record evidence he cites, taken in complete context, shows that Defendants' assertion is correct.  (Dkt. No. 35, Attach. 4, at 33-36.)  Nevertheless, the Court has reformulated Defendants' assertion to more accurately reflect the relevant record evidence.

83.     On October 29, 2019, the Roe-Doe Investigation Team met on campus with Roe to conduct her interview (the "Roe Interview").

84.     Professor Ann Lascamana was Roe's selected advisor, and she accompanied her to the Roe Interview.

85.     During the Roe Interview, Roe informed the Roe-Doe Investigation Team of her perception and recollection of the Incident.

86.     On October 29, 2019, the Roe-Doe Investigation Team met on campus with Doe to conduct his interview (the "Doe Interview").

87.     Franklin accompanied Doe to the Doe Interview.

88.     During the Doe Interview, Doe informed the Roe-Doe Investigation Team of his perception and recollection of the Incident.

89.     In addition to the Roe Interview and the Doe Interview, the Roe-Doe Investigation Team interviewed twenty-three witnesses, comprised of thirteen individuals whom Roe had identified, six individuals whom Doe had identified, and four individuals whom the Roe-Doe Investigation Team had identified.[33]

90.     The Roe-Doe Investigation Team did not decline to interview any of the witnesses identified by Roe and Doe, contacting each of them to request a meeting, but two of the witnesses Doe identified declined to be interviewed.

---

[33]     Defendants asserted that the investigation team had interviewed eight individuals for Doe.  (Dkt. No. 26, Attach. 37, at ¶ 94.)  However, as Plaintiff correctly notes, Defendants are mistaken.  Although Doe requested that the investigation team interview eight individuals initially, the team only interviewed six of those eight because two individuals declined to be interviewed.  (Dkt. No. 26, Attach. 40, at 3.)

91.     All of the interviewed witnessed were able to testify about their interactions with Roe and/or Doe leading up to and/or after the encounter in Doe's room.[34]

92.     Roe's identified witnesses provided information concerning Roe's demeanor and behavior following the incident.[35]

93.     The Roe-Doe Investigation Team interviewed all but one of the witnesses between October 29, 2019, and December 18, 2019 (the "Witness Interviews").

94.     The Roe Interview, the Doe Interview, and the Witness Interviews were recorded on audio, transcribed, and summarized in the Roe-Doe Investigation Report.

95.     Roe, Doe, and each of the witnesses were invited to review their respective interview transcripts and to approve, suggest edits, or provide clarifying comments to their interview.

96.     Roe reviewed her transcript and made certain additions and clarifications within the transcript text.

97.     Doe reviewed his transcript and submitted a single-page document expanding and clarifying information contained in his interview transcript.

98.     Some witnesses took advantage of the opportunity to review their transcripts; others did not.

---

[34]     Plaintiff denies the asserted fact on the grounds that two witnesses, K.B. and B.C., did not observe Roe or Doe's level of intoxication that night and could only testify to Roe's behavior in the days after the alleged incident. (Dkt. No. 35, Attach. 48, at ¶ 96.)  Plaintiff is correct; thus, the Court has modified the asserted fact to reflect the record evidence.

[35]     Plaintiff admits this asserted fact, but then appears to deny the fact, albeit not explicitly, by adding commentary that states that the witnesses provided other information, beyond what Defendants assert. (Dkt. No. 35, Attach. 48, at ¶ 97.)  This in no way controverts the asserted fact; therefore, the Court will deem it admitted.

99.     All revisions, additions, or clarifications provided by Roe, Doe, or any witnesses were appended to the Roe-Doe Investigation Report at the conclusion of the Roe-Doe Investigation.[36]

100.     The Roe-Doe Investigation Team collected evidence from the parties and witnesses in the form of Snapchat messages, text messages, photographs, videos, and journal entries, all of which the Roe-Doe Investigation Report identifies.[37]

101.     The Roe-Doe Investigation Team received surveillance video footage from the jitney that transported Roe and Doe from downtown Clinton back to campus and from video cameras across campus.

102.     The Roe-Doe Investigation team reviewed the video surveillance with Roe during their interview of her.[38]

103.     After conducting the Roe-Doe Investigation, the Roe-Doe Investigation Team issued the Roe-Doe Investigation Report.

---

[36]     Plaintiff admits a fact not asserted, and fails to specifically deny the fact asserted (much less cite any record evidence in support of such a denial).  (Dkt. No. 35, Attach. 48, at ¶ 104.)  This in no way controverts the asserted fact; therefore, the Court will deem it admitted.

[37]     Plaintiff admits this asserted fact, but then adds impermissible commentary (regarding the Investigation Team's failure to collect Roe's SANE examination).  (Dkt. No. 35, Attach. 48, at ¶ 105.)  This in no way controverts the asserted fact; therefore, the Court will deem it admitted.

[38]     Plaintiff admits that the Roe-Doe Investigation Team showed the surveillance videos to Roe during her interview, but denies that they showed the videos to him during his interview.  (Dkt. No. 35, Attach. 48, at ¶ 107.)  In support of this partial denial, Plaintiff cites his own declaration (Dkt. No. 35, Attach. 38), e-mails between himself and Berryman that summarize a March 2020 meeting to review videos (Dkt. No. 35, Attach. 42), his deposition transcript (Dkt. No. 26, Attach. 36), and the allegations in the Complaint (Dkt. No. 1, at 24).  The Court finds that it is unclear from the record evidence whether Doe reviewed the surveillance video with the Roe-Doe Investigation Team during his October 29 interview.  Thus, Defendants' asserted fact has been modified to reflect only the portion that Plaintiff has admitted to.

104.    The Roe-Doe Investigation Report included an overview of the Roe-Doe Investigation, including interviews conducted and evidence collected, a recitation of the perspectives gathered during the Roe-Doe Investigation, the impact of the incident and Roe-Doe Investigation shared by Roe and Doe, and the Roe-Doe Investigation Team's impressions of the reliability of information presented by parties and witnesses.  It does not contain any recommendations or conclusions.[39]

105.    On or around March 4, 2020, the initial Roe-Doe Investigation Report was completed.

106.    Pursuant to the Policy, Roe and Doe each had the opportunity to review the initial Roe-Doe Investigation Report and respond to any information contained therein.

107.    The initial investigation report was made available to the parties on or about March 6, 2020.

108.    On or about March 9, 2020, Doe reviewed a hard copy of the initial investigation report in Ms. Berryman's office.

109.    In addition to reviewing the initial investigation report, Doe reviewed surveillance video and another video provided by Roe with Ms. Berryman on March 9 and 10, 2020.[40]

---

[39]    Plaintiff expressly admits the asserted fact, but then impermissibly adds commentary stating that it is unclear what is meant by the phrase "the impact of the incident and Roe-Doe Investigation shared by Roe and Doe . . . ." (Dkt. No. 35, Attach. 48, at ¶ 109.)  As an initial matter, Plaintiff fails to cite record evidence in support of any denial. (*Id.*)  Furthermore, as stated, the assertion is supported by the record evidence cited. The Court notes that a comparison of the phrase in question and the underlying record evidence reveals that Doe and Roe were both asked at various times how the incident and investigation had impacted their lives, and their responses were incorporated into the report.

[40]    Plaintiff denies this fact to the extent that it asserts that his second meeting with Berryman to review surveillance footage occurred on March 10, not on March 11 as Defendants assert. (Dkt. No. 35, Attach. 48, at ¶ 114.)  After carefully reviewing the evidence Plaintiff submits in support of his denial, as well as the record evidence cited by Defendants, the Court

110.     Following his review of the initial Roe-Doe Investigation Report, Doe asked the

Investigation Team to interview another witness, P.M., whom Doe had identified at his initial

interview but had originally instructed the team not to interview because he was friends with

both Doe and Roe.[41]

111.     Berryman requested the Roe-Doe Investigation team include additional video

surveillance she had reviewed with Roe and Doe in the report.[42]

112.     On March 11, 2020, Doe advised Berryman that he had retained Attorney Tara

Davis of Nesenoff & Miltenberg to act as his advisor moving forward in the process and

requested an extension of time to respond to the initial Roe-Doe Investigation Report.[43]

---

finds that Plaintiff is correct, and the second meeting to review surveillance footage occurred on
March 10, not March 11 as Defendants assert.  (See Dkt. No. 26, Attach. 10 [indicating that
Plaintiff was notified by Berryman on March 9 that there was an additional video for him to
review and Berryman would like to schedule a meeting, and that he wrote on March 9 to
Berryman, "I would like to come in at 11 to see the video."]; Dkt. No. 35, Attach. 11 [indicating
that Plaintiff wrote "I am here" to Berryman on March 10 with an e-mail that had a subject line
of "Meeting"].)  The asserted fact has therefore been modified to reflect the correct date.

[41]     Plaintiff denies this fact to the extent that it asserts that P.M. was an "additional witness."
(Dkt. No. 35, Attach. 48, at ¶ 115.)  The Court finds that Plaintiff is correct: P.M. had been
originally identified by Doe.  The Court has therefore modified the asserted fact to more closely
follow the record evidence that Plaintiff cites.  (Dkt. No. 26, Attach. 41, at 2-3.)

[42]     Although Plaintiff expressly admits this asserted fact, he contends that one of the sources
Defendants cite does not support it.  (Dkt. No. 35, Attach. 48, at ¶ 116.)  Because Plaintiff
admitted to the fact, and because the other source Defendants cite does support the asserted fact,
the Court will deem the fact admitted.

[43]     Plaintiff denies this asserted fact in its entirety, but then states that on March 11 he
informed Berryman that he (Plaintiff) had planned to meet with Attorney Davis on March 13.
(Dkt. No. 35, Attach. 48, at ¶ 117.)  The evidence Plaintiff cites in support of this assertion (Dkt.
No. 35, Attach. 36) clearly shows that Doe informed Berryman via e-mail sent on March 11 that
he was meeting with Attorney Davis.  The same e-mail also requests an extension to file his
response.  The Court has therefore modified Defendants' asserted fact to reflect the correct date,
March 11.

113.    Berryman granted the extension of time and provided Attorney Davis access to the electronic data room containing the initial Roe-Doe Investigation Report.

114.    On March 19, 2020, Doe responded to the initial Roe-Doe Investigation Report.

115.    Doe pointed out conflicting testimony and inconsistencies that he had identified in the initial investigation report.

116.    After updating the initial Roe-Doe Investigation Report with the additional witness and video surveillance, the Roe-Doe Investigation Team provided Roe and Doe an updated Roe-Doe Investigation Report, completed on or about March 25, 2020, for their review.

117.    Both Roe and Doe reviewed the updated Roe-Doe Investigation Report and submitted comments thereto, which were incorporated into the final Roe-Doe Investigation Report as appendices.

118.    On or around April 2, 2020, the Roe-Doe Investigation Report, consisting of 74 pages and 29 appendices, was finalized.[44]

119.    At the time of his investigation interview, Doe provided all of the evidence that he had about the complaint against him to the Roe-Doe Investigation Team.[45]

---

[44]    Defendants originally asserted that the report was finalized on April 4, 2020, not April 2, 2020.  However, as Plaintiff notes, the report is dated April 2, 2020.  (Dkt. No 26, Attach. 40, at 2.)  The Court has therefore modified the asserted fact to reflect the correct date.

[45]    Plaintiff denies the asserted fact, but he fails to cite record evidence that controverts the asserted fact.  (Dkt. No. 35, Attach. 48, at ¶ 124.)  More specifically, Plaintiff asserts that, because he had not reviewed video surveillance footage, he did not have all of the evidence during the time in question.  However, Plaintiff is mistaken because the fact is not asserting that Defendants turned over all of the evidence to Doe (or that Doe turned over all of the evidence that ultimately existed to Defendants), but rather that Doe turned over all of the evidence "that he had" to Defendants.  Both parties cite the same part of Doe's deposition, wherein the following exchange took place:

**The Roe-Doe Review Panel**

120.   Berryman and Orvis selected Professors Sally Cockburn and Ian Rosenstein and Dean Allen Harrison, all of whom were HSMB members, to serve on the Roe-Doe Review Panel with Orvis.

121.   On April 4, 2020, Berryman informed Doe that the Roe-Doe Review Panel would meet on April 9, 2020.  She informed Doe of the identities of the panel members and what the role of the Chair was, and she also informed Doe that he and Roe had the option to meet with the panel, separately, on April 9, before their deliberations on that date.

122.   Berryman provided the Roe-Doe Review Panel the Roe-Doe Complaint, the final Roe-Doe Investigation report, and surveillance video reviewed during the Roe-Doe Investigation.

123.   The Roe-Doe Review Panel reviewed the materials provided.

124.   Pursuant to the Policy, both Roe and Doe were entitled to meet with the Roe-Doe Review Panel prior to deliberations, and the panel did so separately on April 9, 2020.

125.   The Roe-Doe Review Panel began its deliberations later on April 9, 2020, discussing the information provided in the Roe-Doe Investigation Report and obtained directly from the parties.

126.   The Roe-Doe Panel discussed specifically each charge and whether the information collected during the Roe-Doe Investigation and the parties' presentations to the Roe-

---

Q.   Okay. Other than what is written on Exhibit 4, was there any information that you had about the complaint against you that you did not provide to the investigators?

A.   Based on all the evidence I had at that time, no.

(Dkt. No. 26, Attach. 36, at 128: 19-24.)

Doe Review Panel supported (by a preponderance of the evidence) the finding that Doe was responsible for the charges.

127.    The Roe-Doe Panel met for approximately three hours on April 9, 2020, with approximately one to one and one-half hours spent in deliberations, and the remainder of the time spent interviewing Roe and Doe and reviewing the case file.[46]

128.    The Roe-Doe Review Panel unanimously decided that Doe had violated the Policy on three out of the four charges contained in the Roe-Doe Complaint.

129.    Consistent with its previously discussed intention to apply a preponderance of the evidence standard (as set forth above in Fact No. 125), the Roe-Doe Review Panel appears to have applied the preponderance-of-the-evidence standard when evaluating the complaint and determining whether the evidence supported a finding of responsibility (as the Panel usually did when determining such responsibility).[47]

---

[46]    Plaintiff denies Defendants' asserted fact and contends that the entire meeting on April 9 took between one hour and one and one-half hours.  (Dkt. No. 35, Attach. 48, at ¶ 132.)  In support of this denial, Plaintiff cites the deposition of Orvis (Dkt. No. 35, Attach. 5, at 78: 6-17) and Cockburn (Dkt. No. 35, Attach. 9, at 33:4-6).  However, Plaintiff is mistaken because he fails to consider the whole context of Orvis and Cockburn's depositions.  Both testified that the panel deliberated for approximately between one hour and one and one-half hours, but the whole meeting, which included both parties making statements and the panel reviewing the case file, took three hours.  The asserted fact has therefore been modified to reflect the evidence.

[47]    Plaintiff denies this fact, and contends that the record evidence cited by Defendants (Dkt. No. 26, Attach. 27) fails to describe the standard of review as being by the preponderance of the evidence.  (Dkt. No. 35, Attach. 48, at ¶ 134.)  Granted, the record evidence Defendants cite does not explicitly state that the panel applied a preponderance of the evidence standard.  However, it does explicitly state that the panel found Doe "responsible" for violating numerous school policies, and it is well established through other record evidence that HSMB review panels applied a preponderance-of-the-evidence standard when determining whether a respondent was "responsible" for violating a school policy.  Indeed, elsewhere in his response to Defendants' Statement of Material Facts, Plaintiff admits that HSMB review panels used the preponderance-of-the-evidence standard of review when determining responsibility.  (Dkt. No. 35, Attach. 48, at ¶ 28.)  For these reasons, the Court has modified the above-stated fact by including the words "appears to have applied."

130.    The Roe-Doe Review Panel issued a findings report (the "Roe-Doe Findings Report") stating that Doe violated the Policy by committing two non-consensual sexual acts and one instance on non-consensual sexual contact against Roe.

131.    On April 21, 2020, Berryman sent the Roe-Doe Findings report to Roe and Doe.

132.    Pursuant to the Policy, Doe and Roe were provided the opportunity to submit impact statements following the Roe-Doe Findings Report, and both parties did so.

133.    At that time, pursuant to the Policy, Doe was advised that students found responsible for committing a non-consensual sexual act should "normally" expect to be suspended or expelled.[48]

134.    Pursuant to the Policy, the Roe-Doe Review Panel convened on April 30, 2020, to consider the impact statements and what sanction to impose upon Doe.

135.    The Roe-Doe Review Panel unanimously recommended to expel Doe from College (the "Sanction Recommendation").

136.    Pursuant to the Policy, the Roe-Doe Review Panel issued the sanction recommendation to the senior staff member, Martinez.[49]

---

[48]    Plaintiff denies the entirety of the fact originally asserted by Defendants (which omits the word "normally") because the Policy states that students should "normally" expect to face suspension or expulsion if they were found responsible for sexual misconduct.  (*Compare* Dkt No. 26, Attach. 37, at ¶ 138 *with* Dkt. No. 35, Attach. 48, at ¶ 138.)  The Court deems the remainder of the fact admitted because Plaintiff has not cited record evidence that explicitly controverts the remainder of the asserted fact; but the Court has modified the asserted fact by inserting the word "normally" so that it more closely conforms to the Policy.

[49]    Although Plaintiff expressly admits this asserted fact in its entirety, he contends that one of the sources Defendants cite does not support it.  (Dkt. No. 35, Attach. 48, at ¶ 141.)  Plaintiff is correct.  However, because Plaintiff admitted to the fact, and because the other source Defendants cite does support the asserted fact, the Court will deem the fact admitted.

137.    Martinez accepted the Roe-Doe Review Panel's sanction recommendation after reviewing the Roe-Doe Investigation Report and the Roe-Doe Findings Report.[50]

138.    Martinez spoke directly with Doe to inform him of her decision, and on May 11, 2020, a letter confirming the same and including appeals information was sent to Doe.

139.    Martinez also informed Roe of the Sanction.

### The Doe Appeal

140.    On or about May 22, 2020, Berryman provided Collett with a copy of an appeal statement sent to Berryman by Doe (the "Doe Appeal").

141.    Pursuant to the Policy procedures, Collett sent the Doe Appeal to the other members of the Appeals Board and the HSMB Chair.

142.    On May 30, 2020, the HSMB Chair responded to the Doe Appeal (the "HSMB Response").

143.    Collett also asked Berryman to provide Roe with information about the Doe Appeal and her right to respond.

144.    On June 2, 2020, the Appeals Board met to determine whether the issues raised within the Doe Appeal fell within permissible grounds for appeal under the Policy.

145.    On June 3, 2020, Collett wrote to Doe to inform him that the Appeals Board

---

[50]    Plaintiff denies Defendants' assertion that Martinez reviewed the appendices to the Investigation Report, relying on Martinez's deposition testimony that she does not "typically read through [the witness interview transcripts]" that are found in the appendices of the Investigation Report. (Dkt. No. 35, Attach. 48, at ¶ 142; Dkt. No. 35, Attach. 10, at 46:1-13.) Plaintiff is correct. Furthermore, in her declaration, which Defendants cite, Martinez stated that she "focused" her review on the Roe-Doe Investigation Report, but she was also "provided with the appendices to the report." (Dkt. No. 26, Attach. 25, at ¶ 19.) She did not declare that she reviewed the appendices. The Court has therefore modified the asserted fact by deleting any mention of the appendices to reflect the declaration and deposition testimony of Martinez.

understood the Doe Appeal to be asserting two specified grounds for appeal: (i) procedural errors affected the outcome of the process; and (ii) new evidence (a polygraph test and additional statement) should be considered when determining whether he had violated the Policy (the "June 3 Correspondence").

146.     The HSMB Response asserted as follows: (i) of the two pieces of "new evidence" that Doe had tried to present, the first piece was not "new," was not acceptable under the HSMB policy, and was not even yet in existence, and the second piece did not seem to indicate any hostility or bias toward Doe by a witness who was "crucial" in the case or "important" in the review panel's deliberation; and (ii) the procedural errors asserted by Doe were "not true," "did not amount[] to procedural error," did not prevent Doe from accessing "electronic files," were "[not] grounds for appeal," were not unfairly prejudicial to Doe, "had no significant effect on the review panel's findings," and/or were unsupported by evidence.[51]

147.     The June 3 Correspondence informed Doe that, based on the information contained in the Doe Appeal, there was no "new evidence" to consider, but that the Appeals Board would review whether his allegations of procedural errors had merit.

148.     The June 3 Correspondence informed Doe that the Appeals Board struggled to understand the Doe Appeal, which contained a large number of allegations, and thus, review would take time.

---

[51]     Plaintiff denies this asserted fact in its entirety and contends that the HSMB Response to his appeal did not explicitly state that the "new evidence" did not require modification of the Roe-Doe Findings Report or that procedural error did not affect the outcome of the process. (Dkt. No. 35, Attach. 48, at ¶ 151.)  The Court has modified Defendants' factual assertion to more accurately reflect the HSMB Response.  (Dkt. No. 26, Attach. 31.)

149.     With the possible exception of the Chair of the three-person Appeals Board Brian Collette (who was "pretty sure" that he did not view "all" of the videos), the Appeals Board received and substantially reviewed the Roe-Doe Complaint, the Roe-Doe Investigation Report, video surveillance from the Roe-Doe Investigation, the Roe-Doe Findings Report, the Sanction Recommendation, Martinez's sanction decision, and information concerning the parties' access to the electronic data room.[52]

150.     The Appeals Board met multiple times to discuss the Doe Appeal.

151.     The Appeals Board determined there were no procedural errors that affected the outcome of the process, thus denying the appeal.

152.     On June 18, 2020, the Appeals Board Chair informed Doe it did not find support for his position that procedural errors affected the outcome of the process.

153.     The Appeals Board decision is the final step in the resolution process.

154.     As a result of the findings of responsibility under the Policy and the associated sanction, a notation was placed on Doe's academic transcript that stated that he was "expelled after a finding o[f] responsibility for a code of conduct violation."

###### C.     Parties' Briefing on Defendants' Motion for Summary Judgment

###### 1.     Defendants' Memorandum of Law

---

[52]     Plaintiff denies Defendants' asserted fact to the extent it asserts that the Chair of the three-member Review Board (Brian Collette) reviewed the video surveillance from the Roe-Doe Investigation. (Dkt. No. 35, Attach. 48, at ¶ 154.)  In support of this denial, Plaintiff relies on the deposition testimony of Brian Collette that "I couldn't swear that I read absolutely everything. I'm pretty certain I did not view all of the videos.  I remember reading a very large amount of text.  I can't swear that I read absolutely everything."  (Dkt. No. 35, Attach. 8, at 69-70 [Collette Depo. Tr.].)  Therefore, the Court has modified the asserted fact accordingly.

Generally, in their motion for summary judgment, Defendants argue that, because there are no material facts in dispute, they are entitled to summary judgment on Plaintiff's claims. (Dkt. No. 26, Attach. 38, at 2 [Defs.' Mem. of Law].)[53]  More specifically, Defendants make three principal contentions.[54]

First, Defendants contend that Plaintiff's first and fourth claims (for violation of Title IX and NYSHRL respectively) must be dismissed for four reasons: (1) Defendants' disciplinary outcome was supported by the evidence and there was no articulable doubt as to the outcome of the proceedings; (2) Defendants' decisions were not motivated by gender bias, because (a) the timing of the parties' review of the surveillance footage had no impact on the outcome of the proceedings, (b) the reason that more pages of the Investigation Report are devoted to Roe than to Plaintiff is because Roe's witnesses offered more information, (c) there was a legitimate gender-neutral explanation for the difference in timing between when Roe reviewed her transcript and when Plaintiff reviewed his transcript, (d) Plaintiff never actually filed a complaint with Defendants against Roe, (e) Plaintiff and Roe received identical instructions on the confidentiality of the process, and Plaintiff never raised with Defendants his concerns that Roe was breaching confidentiality rules by discussing the matter with other members of the Hamilton College community, (f) Plaintiff and Roe received the same offer of counseling services, and Plaintiff would have been provided transportation for medical services had he requested it, and (g) the Investigation Report and witness transcripts contained no references to the "criminal

---

[53]     Record citations in this Decision and Order are to the screen numbers on the District's Case Management / Electronic Case Filing ("CM/ECF") System, not the page numbers stated on the documents themselves.

[54]     In order to be consistent, the Court has organized the arguments in Defendants' motion to match the order of the claims in Plaintiff's Complaint.

process," and any redactions of interview transcripts were done pursuant to the Policy in order to protect privacy and remove irrelevant or prejudicial information; (3) Defendants' disciplinary outcomes do not show gender bias, because the fact that all expelled students have been male is merely a function of the gender makeup of the parties involved in the alleged Policy violations; and (4) Defendants' did not find Plaintiff responsible for Policy violations because of outside pressure from the federal government and student groups that called for aggressive punishment of male students, given that (a) such allegations are speculative, (b) such allegations are insufficient to support an inference of gender bias, and (c) no record evidence exists that shows that outside pressures influenced the disciplinary proceedings.  (*See generally id.*)

Second, Defendants contend that Plaintiff's second claim (for breach of contract) must be dismissed for five reasons: (1) Defendants did not breach their obligation to provide fair process, given that (a) Plaintiff was provided access to surveillance videos, (b) he was not entitled to review evidence prior to the initial investigation report, (c) technical difficulties with electronic access to the initial investigation report did not result in a breach of the Policy, and (d) his disagreement with the findings does not constitute a breach of the Policy; (2) Defendants did not deprive Plaintiff of access to information or evidence; (3) Defendants invited Plaintiff to pose questions for witnesses; (4) Defendants notified Plaintiff of the recommended sanction; and (5) Defendants did not breach the Policy with respect to Roe's advisor.  (*See generally id.*)

Third, Defendants contend that Plaintiff's third claim (also for breach of contract based on a "denial of basic fairness/arbitrary and capricious decision making") must be dismissed, because he received all of the protections and rights guaranteed under the Policy, and his preference for a different policy cannot form a breach of contract claim.  (*See generally id.*)

      **2.**      **Plaintiff's Opposition Memorandum of Law**

Generally, in his opposition memorandum of law, Plaintiff makes two principal contentions.  First, Plaintiff contends that Defendants violated Title IX and the NYSHRL by reaching an erroneous outcome in the disciplinary decision against him, because (1) Defendants' process caused an articulable doubt as to the veracity of the proceedings against him; and (2) Defendants' findings against Plaintiff were motivated by gender bias, given that (a) outside pressure from the federal government and student groups created a general "anti-male bias [that] pervaded the sexual misconduct investigation," (b) he was not permitted to file a complaint against Roe, (c) Defendants – including Defendants' president, David Wippman – exchanged e-mails with Roe's parents that demonstrate bias, given (i) the content of the e-mail messages, (ii) the timing of one e-mail message (i.e., the fact that Roe's parents sent Wippman an e-mail on the same day that the HSMB Review Panel's decision was released), and (iii) the absence of any communications between Wippman and Plaintiff's parents, and (d) Defendants' historical disciplinary decisions demonstrate a pattern of gender bias against male students.  (*See generally* Dkt. No. 35 [Plf.'s Opp'n Mem. of Law].)

Second, Plaintiff contends that Defendants breached the Policy and denied Plaintiff basic fairness, because (1) Defendants failed to provide a fair disciplinary process, given that (a) Berryman acted beyond the scope of her duties as Title IX Coordinator, by (i) taking Roe to her SANE exam, and (ii) helping facilitate a meeting between Roe and law enforcement, (b) the Investigation Team presumed him responsible and conducted an investigation intended to reach a predetermined result, by (i) failing to interview Roe and Plaintiff twice even though they had interviewed complainants and respondents twice during similar investigations in the past, (ii) failing to adequately investigate photographs of Roe's bruising, and (iii) failing to collect Roe's SANE exam results, and (c) the Roe-Doe Investigation Report contained references to an

ongoing criminal investigation involving Plaintiff; (2) Defendants deprived Plaintiff of meaningful access to information and evidence, given that (a) they withheld from him surveillance video footage, (b) they failed to obtain and never provided him with Roe's SANE Report, (c) he was not provided copies of text messages exchanged between Roe and Witness K.S. from the night of the alleged incident, and (d) he reviewed his interview transcript only after Roe had reviewed her own; (3) Defendants denied Plaintiff the opportunity to propose questions for witnesses, given that (a) he did not know the identities of seventeen of the twenty-four witnesses in his case until March 2020, and (b) he could not review the interview transcripts of those witnesses until March 2020; and (4) Defendants failed to appoint a properly trained investigator.  (*See generally id.*)

### 3.  Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants make two principal contentions.  First, Defendants contend that Plaintiff failed to create a genuine dispute of material fact to defeat their motion for summary judgment on his Title IX claim, because (1) the Review Panel's decision was not erroneous given that the decision was made based on evidence, and the evidence did not favor Plaintiff; and (2) the Defendants' did not engage in gender biased behavior, given that (a) he supported his "complaint" against Roe (assuming that he even filed one) with only a blanket denial of her accusations and not any specific facts that supported his claim that her complaint was false, (b) Wippman's communications were gender neutral and he did not participate in the proceedings and any biased statements came from Roe's parents, (c) their disciplinary history treats all sexes equally, and they have held males "not responsible" for similar conduct that Plaintiff was accused of engaging in.  (*See generally* Dkt. No. 26, Attach. 38 [Defs.' Reply Mem. of Law].)

Second, Defendants contend that Plaintiff has failed to create a genuine dispute of

material fact to defeat their motion for summary judgment on his breach of contract claims,

because he cannot cite any specific provisions of the Policy that were breached.  (*See generally*

*id.*)

## II.    RELEVANT LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as

a matter of law." Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is

such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[55]  As for the materiality requirement, a dispute of fact is

"material" if it "might affect the outcome of the suit under the governing law . . . .  Factual

disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S.

317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must

---

[55]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to
create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d, 400 (2d Cir. 1998) [citation
omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply
show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,
Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[56]  Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F.Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1(b).[57]  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[58]

---

[56]     *Cusamano v. Sobek*, 604 F.Supp.2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[57]     Local Rule 56.1 was formerly known as L.R. 7.1(a)(3) before the Local Rules were amended January 1, 2021.

[58]     Among other things, Local Rule 56.1(a) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 56.1(a).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have consented to the legal arguments contained in that memorandum of law under Local Rule 56.1(b).[59]

## III.   ANALYSIS

### A.   Whether Plaintiff's Sex Discrimination Claims Under Title IX and the NYSHRL Must Be Dismissed[60]

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 26, Attach. 38; Dkt. No. 38.)  To those reasons (which are summarized above in Part I.C of this Decision and Order), the Court adds the following analysis, which is intended to supplement and not supplant those reasons.

"Title IX provides, in relevant part, that '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving [f]ederal financial assistance.'"

---

[59]   *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 WL 325378, at *8 (N.D.N.Y. Mar. 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under N.D.N.Y. L.R. 56.1(b)); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to an "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

[60]   The Court will analyze both Plaintiff's Title IX claim (his first claim) and NYSHRL (his fourth claim) together because the same legal standard applies to both claims, and because the parties addressed both claims together in their memoranda of law.  *Doe v. Colgate Univ.*, 457 F. Supp. 3d 164, 170 n.3 (N.D.N.Y. 2020) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000)); *Doe v. Siena Coll.*, 22-cv-1115 BKS/TWD, 2023 WL 197461, at *14 (N.D.N.Y. Jan. 17, 2023).

*Doe v. Syracuse Univ.*, 457 F. Supp. 3d 178, 193 (N.D.N.Y. 2020) (McAvoy, J.) (citing 20

U.S.C. § 1681(a), reconsidered on other grounds, 17-CV-0787, 2020 WL 3453500 (N.D.N.Y.

June 24, 2020) (McAvoy, J.).

"In the context of university discipline, the Second Circuit has recognized two categories

of Title IX claims: (1) claims of an erroneous outcome from a flawed proceeding, and (2) claims

of selective enforcement." *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 461 (S.D.N.Y.

2015) (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). Here, liberally construed,

Plaintiff's Complaint alleges that Defendants reached an erroneous outcome when it found him

responsible for committing sexual assault and expelled him. (*See generally* Dkt. No. 1 [Plf.'s

Complaint]; Dkt. No. 35 [Plf.'s Opp'n. Mem. of Law].)

"To prevail on an erroneous outcome claim, Plaintiff must 'demonstrate (1) articulable

doubt [as to] the accuracy of the outcome of the disciplinary proceeding, and (2) that gender bias

was a motivating factor behind the erroneous finding.'" *Doe v. Syracuse Univ.*, 457 F. Supp. 3d

at 200 (citing *Doe v. Colgate Univ.*, 760 Fed. Appx. 22, 30 (2d Cir. 2019) (summary order)).

## 1.    Articulable Doubt

"To establish such an 'articulable doubt,' the [p]laintiff must point to evidence of

'particular evidentiary weaknesses behind the finding of an offense such as motive to lie on the

part of a complainant or witnesses, particularized strengths of the defense, or other reason to

doubt the veracity of the charge.'" *Id.* (citing *Yusuf*, 35 F.3d at 715). "A plaintiff can also point

to 'particular procedural flaws affecting the proof.'" *Id.* (citing *Yusuf*, 35 F.3d at 715).

Plaintiff argues that the evidence adduced by the Roe-Doe Investigation Team did not

support the Panel's finding that he was responsible for violating three provisions of the Policy.

(*See generally* Dkt. No. 35.)  More specifically, Plaintiff argues that Roe was capable of consenting, and actually consented, to all sexual activity.  (*Id*. at 12.)[61]

Here, the Court has some trouble finding that the mere fact that *some* of the 32 witnesses interviewed questioned the *apparent level* of Roe's drunkenness less than a half-hour before she entered Doe's room, even when coupled with Doe's testimony that *at one point* Roe had said it was "fine, we can still do this," constitutes an evidentiary weakness of the panel's preponderance-of-the-evidence finding that Roe lacked the capacity to give affirmative consent to sexual contact, given the amount of alcohol she had consumed, her account of her level of consciousness, and the bruising on her arms and thighs.  However, for the sake of brevity, the Court will assume that there exists admissible record evidence from which a rational jury could find a genuine dispute of material fact regarding whether Plaintiff has demonstrated an articulable doubt as to the accuracy of the outcome of the disciplinary proceeding.  *See, e.g., Doe v. Colgate Univ.*, 760 F. App'x 22, 30 (2d Cir. 2019) (assuming "that [the plaintiff's] insistence that the sexual encounters were consensual was sufficient to raise a disputed issue of material fact on the question of misconduct"); *Doe v. Colgate Univ.*, 457 F. Supp. 3d at 170 (assuming same).  The Court notes that, on a motion for summary judgment, it must "mak[e] all inferences

---

[61]     In support of their arguments, both parties repeatedly cite generally to Exhibit F to the Declaration of Catherine Berryman (or two Dkt. No. 26, Attach. 12, which contains a one-page exhibit letter as a placeholder), in violation of Local Rule 56.1.  (Dkt. No. 26, Attach. 12.)  *But see* N.D.N.Y. L.R. 56.1(a), (b) (requiring "a specific citation to the record" to establish or controvert factual assertions on a motion for summary judgment).  However, because of its size (which was approximately 689 pages), Attachment 12 was broken up into fifteen parts for purposes of electronic filing.  (Dkt. No. 26, Attachs. 40-54.)  In the future, counsel are respectfully requested to provide specific citations to the relevant attachment in question.  In any event, the Court has carefully verified each parties' general citations to Exhibit F by matching them with the relevant page of the particular corresponding exhibit in the Court's electronic filing system.

and resolv[e] all factual disputes in Plaintiff's favor . . . ." *Doe v. Syracuse Univ.*, 457 F. Supp. 3d at 201.

However, for Plaintiff's claims to survive Defendants' motion, there also must be a genuine dispute of material fact as to whether Defendants' actions were motivated by gender bias.

### 2.     Gender Bias

"Gender bias in a Title IX action may be shown by evidence such as 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.'" *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d at 474–75 (citing *Yusuf*, 35 F.3d at 715).

For the reasons listed below, the Court does not find any disputed material facts that suggest gender bias played a role in Defendants' disciplinary procedures and decision making. Although Plaintiff may disagree with the "credibility determinations and factual conclusions" of the HSMB Review Panel, the Court cannot "second-guess" those decisions without gender bias. *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d at 462.

### a.     General Anti-Male Bias

Plaintiff cannot survive summary judgment by simply arguing that policy changes from the federal government and pressure from student groups created gender bias in an individual disciplinary decision. *See Doe v. Colgate Univ.,* 760 F. App'x at 30 (granting summary judgment because that university's sexual assault forum, 2011 Department of Education letter, and university president's message addressing sexual assault did not create a genuine dispute of material fact suggesting gender bias); *Doe v. Syracuse Univ.*, 457 F. Supp. 3d at 202 (granting summary judgment because allegations of federal government investigations into defendant over

its handling of sexual assaults and a general societal animus toward men accused of sexual

assault did not create a genuine dispute of material fact suggesting gender bias); *cf. Schiebel v.*

*Schoharie Cent. Sch.*, 22-CV-01109, 2023 WL 4305215, at *6 (N.D.N.Y. June 30, 2023) (Kahn,

J.) (dismissing a case where plaintiff only alleged that the #Metoo movement and 2011

Department of Education letter created an anti-male bias); *Doe v. New York Univ.*, 438 F. Supp.

3d 172, 186 (S.D.N.Y. 2020) (holding that evidence of #Metoo protests on defendant's campus

and a 2011 Department of Education letter did not create a "plausible inference of sex

discrimination").  In short, there is no admissible record evidence from which a rational jury

could find that Defendants acted out of a general "anti-male bias."

> **b.** **Grounds for Permission to File a Complaint Against Roe**

As a threshold matter, it is unclear whether Plaintiff ever *formally* made a request to file a

complaint against Roe.  Defendants explicitly deny that a formal request was ever made by

Plaintiff, and they note that Plaintiff never pursued the matter after his conversation with

Berryman.  (Dkt. No. 26, Attach. 38, at 19.)  *See Routh v. Univ. of Rochester,* 981 F. Supp. 2d

184, 211 (W.D.N.Y. 2013) (dismissing a claim where the plaintiff alleged that he was not

allowed to file a complaint against his accuser but the record showed that he could have if he had

pursued it as a separate matter outside of the complaint against him).  Indeed, according to

Plaintiff's memorandum of law, he only "*questioned* whether he was permitted to pursue a

harassment claim against Roe was filing a false complaint against him."  (Dkt. No. 35, at 14

[emphasis added].)  Plaintiff's choice of words is telling.  Of course, "question," as a verb,

means "to ask questions of; to interrogate; to put queries to . . . ."  WEBSTER'S NEW TWENTIETH

CENTURY DICTIONARY 1479 (2d ed. 1983).  In short, "to question" does not mean to file or even

demand, but rather to inquire about.  In other words, Plaintiff merely asked if he could file a

counter-complaint against Roe, and Berryman responded that he could if he had specific factual allegations.  This in no way demonstrates gender bias against Plaintiff.

In any event, even if Plaintiff had formally requested to file a complaint, Defendants' response to that request did not constitute a denial and, even if it did so, any such denial was not motivated by gender bias.  Instead, Plaintiff simply failed to meet the standard to file a complaint, while Roe met the same standard.  *Cf. Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643 (D. Conn. 2019) (denying college's motion for summary judgment where the record evidence showed that a male plaintiff was forced to go through an onerous formal complaint process to file a complaint against a female student while one of his female accusers was allowed to file a complaint against him through a less-onerous informal process).

More specifically, Berryman informed Plaintiff that, if he could articulate "'actual specific evidence that somebody filed a false complaint,' she would 'take that seriously and investigate it and take the appropriate steps of the [P]olicy' . . . ."  (*Id.* [quoting Berryman Depo. Tr. at 84-85].)  Likewise, Berryman and Orvis accepted Roe's complaint because she alleged specific facts supporting her complaint.  (Dkt. No. 38, at 4.)   Indeed, Roe told Berryman and Orvis that she drank "a lot" the night of the incident and had trouble remembering some details; however, she remembered the names of people who had seen her that night, details of Plaintiff's room, and being slapped by Plaintiff during sex.  (Dkt. No. 35, Attach. 35, at 4.)  She told Berryman and Orvis that she had bruises on her arms and thighs, and her throat was sore from when Plaintiff shoved his fingers down it.[62]  (*Id.*)  Later, she corroborated these facts during her

---

[62]     Roe later sent investigators photographs of her arms and thighs that appear to depict some bruising.  (Dkt. No. 26, Attach. 42, at 55-58.)  She also sent investigators a photograph of what appears to be her journal, where she describes the incident.  (*Id.*, at 59-60.)

interview with Investigators Green and Kinne.  She stated that her level of intoxication was between a nine and a half and ten, on a scale of one to ten, with [one] being "not really intoxicated, [ten] like drunk."  (Dkt. No. 26, Attach. 41, at 44-45].)  She further told investigators that she "was falling asleep [during sex], and [she] kept falling asleep, and then [Doe] would wake [her] up by sticking his fingers down [her] throat so hard that [she] would gag."[63]  (Dkt. No. 26, Attach. 41, at 31.)

However, in contrast to Roe, Plaintiff's desired complaint against her appears to have resulted from only "a *feeling* that a false complaint had been filed."  (Dkt. No. 35, at 14 [Plf.'s Opp. Mem. of Law] [emphasis added].)  As Berryman testified, "there was no evidence presented or no specific evidence presented other than a feeling that a false complaint had been filed . . . ."  (Dkt. No. 35, Attach. 2, at 85.)  A feeling is akin to a subjective belief; it is not evidence.  *See Doe v. Univ. of Massachusetts-Amherst*, 14-cv-30143, 2015 WL 4306521, at *9 (D. Mass. July 14, 2015) (dismissing a gender-discrimination claim under Title IX where the plaintiff had a strongly felt "subjective belief" that he was discriminated against on the basis of sex); *cf. Brodt v. City of N.Y.*, 4 F.Supp.3d 562, 568 (S.D.N.Y.2014) ("[A] plaintiff's feelings and perceptions of being discriminated against are not evidence of discrimination [under Title VII]." (internal quotation marks omitted)).  Given that a similar allegation could not survive a motion to dismiss for failure to state a claim, it also cannot survive a motion for summary judgment where there is no admissible record evidence to support it.

Finally, even assuming that Roe's complaint was false, there is no admissible record evidence from which a rational juror could find that Defendants' refusal to pursue a complaint

---

[63]      The Court notes that the HSMB Panel "found her testimony quite credible, and [Doe's] less so."  (Dkt. No. 26 Attach. 14, at 4.)

against Roe was based on his sex – aside from the fact that the case involved sexual misconduct. *See Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 364 (S.D.N.Y. 2016) (dismissing the plaintiff's claims and finding that to hold otherwise would "create a new right of action where all students accused of sexual assault could bring a Title IX claim against their educational institutions – so long as they could plausibly plead that the accusations were known to the institution and that the institution failed to silence their accusers – simply because the misconduct they were accused of has a sexual element."); *cf. Doe v. Univ. of Chicago*, 16-cv-08298, 2017 WL 4163960, at *7 (N.D. Ill. Sept. 20, 2017) (writing that "a false accusation of sexual assault is not, without more, harassment based on sex, notwithstanding the sexual content of the accusation[,]" but not dismissing the complaint because the plaintiff alleged that one of defendant's employees encouraged the purported victim to file a false report).  Simply stated, nothing in the record here indicates that Defendants refused to allow Plaintiff to file a complaint against Roe because he was a male.

### c.    E-mails Between Defendants and Roe's Parents

#### i.    Content of E-mails

The Court begins by observing that many of the statements that Plaintiff quotes come from Roe's parents, not from Defendants.  Thus, these statements are not "statements by members of the disciplinary tribunal, [or] statements by pertinent university officials . . . ." *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d at 474-75 (internal quotation omitted). Nevertheless, in support of his argument that statements from Roe's parents created gender bias in Defendants' decisions, Plaintiff cites two cases, *Doe v. George Washington Univ.*, 366 F. Supp. 3d 1 (D.D.C. 2018), and *Menaker v. Hofstra Univ.*, 935 F.3d 20 (2d Cir. 2019). (Dkt. No. 35, at 16.)  Plaintiff's reliance on these cases, however, is unpersuasive.

Setting aside the fact that *Doe v. George Washington Univ.* came from outside the

Second Circuit, and the fact that it addressed a motion to dismiss for failure to state a claim, it is

distinguishable from the current case for two reasons. First, the defendant in *George Washington*

*Univ.* faced far different pressure than did Defendants here.  George Washington University

encountered public student protests against sexual assault, while Defendants here encountered

private e-mails from the distraught parents of Roe.  Second, unlike the record evidence in

*George Washington Univ.,* the record evidence here does not show any statements from

Defendants that could be reasonably construed to show bias against males accused of sexual

assault.

Finally, the Court takes issue with Plaintiff's quote from *George Washington Univ.*  (Dkt.

No. 35, at 16.)  Specifically, Plaintiff writes that, "[t]he court found [in *George Washington*

*Univ.*] that the school's reaction 'demonstrated a concrete link between public criticism of its

Title IX enforcement regime and the results of individual Title IX cases.'"  (Dkt. No. 35, at 16

[quoting *Doe v. George Washington Univ.*, 366 F. Supp. 3d at 12].)  However, the quote Plaintiff

cites comes directly from the plaintiff's complaint in *George Washington Univ.*, which the court

was quoting merely in an effort to summarize the plaintiff's allegations.  *Doe v. George*

*Washington Univ.*, 366 F. Supp. 3d at 12.  Plaintiff's quote is not an actual finding of the court: it

never found a "concrete link" between public pressure and individual Title IX cases.  The

holding of the court is more properly reads as being, "The significance of [the defendant's]

statement [in response to public criticism] is contested – [the defendant's] provided some

clarification in the next paragraph of its statement . . . – *but the combination* of [Department of

Education Office of Civil Rights] investigations, publicized demonstrations, and [the

defendant's] statement are sufficient to avoid dismissal at this point in the litigation."  *Id.* at 13

(emphasis added).[64]  Given that the record evidence here does not include a "combination" of outside investigations, publicized demonstrations, and gender biased public statements from Defendants, Plaintiff cannot even meet the *George Washington* standard to survive a motion to dismiss.

Likewise, Plaintiff's reliance on *Menaker v. Hofstra Univ.*, 935 F.3d 20, is also unpersuasive.  Setting aside the fact that the case addressed a motion to dismiss for failure to state a claim, *Menaker* is distinguishable from the current case because it turned on the requirement that there must be a "clearly irregular investigative or adjudicative process[.]" *Menaker v. Hofstra Univ.*, 935 F.3d 20 at 39.  Here, Plaintiff does not follow his citation of *Menaker* with any citations to admissible record evidence establishing specific instances of Defendants' engaging in an irregular investigative or adjudicative process.  Indeed, the evidence that Plaintiff cites actually illustrates that Defendants followed their own policies.  Furthermore, the content of Wippman's responses is hardly evidence of gender bias.

For example, when Roe's parents asked Wippman to intervene in the investigation – and thus gave him a chance to commit a clear adjudicative irregularity – he responded by stating that he "[could not] intervene in an ongoing Title IX investigation."  (Dkt. No. 35, Attach. 32.)  He then stated, "I know it can be stressful and frustrating to await the the [sic] conclusion of the investigation process, but it's not something we can short-circuit.  We try to be as fair as possible to both parties and to proceed as expeditiously as possible . . . ."  (*Id.*)  Indeed, Wippman's responses can hardly be characterized as biased: they were simply cordial and limited to the

---

[64]     *See also Doe v. New York Univ.*, 438 F. Supp. 3d at 186 ("Plaintiffs' allegations are conclusory and insufficient to establish a plausible inference of sex discrimination considering he neither establishes that [the defendant] was under public criticism during the pendency of the underlying investigations and proceedings nor does he establish [the defendant's] knowledge of the purported criticisms [internal quotations omitted].").

expression of general sympathies to Roe's parents. He also welcomed their feedback on ways to improve the process for sexual assault victims.

In short, when Wippman faced pressure from Roe's parents, he gave a response that acknowledged the rights of both parties in a sexual-misconduct complaint, and nothing in his response can be construed as evidence of gender discrimination. *See Doe v. Colgate Univ.*, 760 F. App'x at 30 (affirming summary judgment where after a university faced outside pressure a university president wrote a public statement that acknowledged both men and women could be victims of sexual assault and that all parties in a misconduct complaint deserved to be treated with respect). Finally, Wippman's efforts to improve the experience of sexual-assault victims on his campus is not evidence of gender bias. *See Doe v. Univ. of Iowa,* 80 F.4th 891, 898 (8th Cir. 2023) ("We are not convinced that institutional efforts to prevent sexual misconduct on campus, including educational programs that challenge students to evaluate the impact of gender norms on rape culture, amount to evidence of external pressure on the University that supports an inference of bias.").

### ii.     Timing of E-mail that Roe's Parents Sent to Wippman

Contrary to Plaintiff's contention, a careful review of the timeline of the e-mails and the HSMB decision reveals that there is nothing to suggest gender bias, or that the e-mail from Roe's parents affected the outcome of the disciplinary decision against Plaintiff.

Roe's parents e-mailed Wippman at 2:12 p.m. on April 21, 2020. (Dkt. No. 35, Attach. 34.) The e-mail was sent only to Wippman, and the record evidence shows that he was not directly involved in the investigation. (*Id.*) At 4:58 p.m. that same day, Berryman sent Plaintiff a copy of the HSMB Panel's decision. (Dkt. No. 26, Attach. 14.) The decision notes that the review panel had met on April 10 and 17, 2021; the decision itself (which was attached in the

April 21 e-mail to Plaintiff) is dated April 10, 2021.  (*Id.*)  On April 21, at 8:52 p.m., Wippman

forwarded Roe's parents' e-mail to Berryman (carbon copying Martinez) and sought advice on

how to respond.  (Dkt. No. 35, Attach. 31.)  At 11:11 p.m. that night, Wippman responded to

Roe's parents.  (Dkt. No. 35, Attach. 34.)  He expressed general sympathies, welcomed any

feedback on the process, and informed them that the findings of the review panel had been sent

out earlier that day.  (*Id.*)

The record evidence reflects that Wippman did not play a role in Plaintiff's disciplinary

proceedings, aside from his responses to Roe's parent's e-mails.  Furthermore, based on the

record evidence, Berryman would not have been aware of the April 21 e-mail from Roe's parents

when she sent the HSMB Panel decision to Plaintiff.  It was only after the decision was released

to Plaintiff that Wippman forwarded Roe's parent's e-mail to Berryman.  Indeed, the record

shows that none of the panel members would have been aware of the e-mail.  Moreover, all of

the deliberations were done prior to the e-mail being sent.  Accordingly, the e-mail from Roe's

parents could not have influenced the disciplinary decision against Plaintiff.

### iii.  Absence of Communications Between Wippman and Plaintiff's Parents

The fact that Wippman never communicated with Plaintiff's parents also does not

demonstrate gender bias.  Wippman never initiated communication with Roe's parents, and there

is no record evidence to suggest that Wippman would *not* have communicated with Plaintiff's

parents had they initiated contact with him.  Although Plaintiff seems to suggest that his parents

were not allowed to participate in the disciplinary proceedings, the record reflects that Plaintiff's

father met multiple times with Berryman, both in-person and via video-teleconference.  (Dkt.

No. 35, Attach. 2, at 213.)  This fact belies any contention that Roe's parents were allowed to be

involved in the disciplinary process, while Plaintiff's parents were not.[65]  Indeed, the record

before the Court is devoid of any evidence from which a reasonable jury could find that

Wippman would not have engaged in the same courtesies with Plaintiff's parents or welcomed

their feedback on the campus experience of students accused of sexual misconduct.  Moreover,

Plaintiff fails to take into account accommodations that he received during the disciplinary

process, such as extensions on the filing of his initial response to the Roe-Doe Investigation

Report.  (Dkt. No. 26, Attach. 11, at 2.)  *See Doe v. Colgate Univ.,* 15-CV-1069, 2017 WL

4990629, at *16 (N.D.N.Y. Oct. 31, 2017) (Kahn, J.), *aff'd*, 760 F. App'x 22 (2d Cir. 2019)

(finding that accommodation of victim's request for a waiting room during a hearing was not

evidence of gender bias because plaintiff did not present evidence that he had also asked for a

waiting room and been denied and further finding that plaintiff received other special treatment

during the proceedings).

### d.      Defendants' Previous Disciplinary Decisions

In support of their arguments regarding whether Defendants' disciplinary history

demonstrates a pattern of gender bias, both parties cite the same chart, which summarizes the

outcomes of Defendants' disciplinary decisions from 2017 to 2020.  (Dkt. No. 26, Attach. 24;

Dkt. No. 35, Attach. 37.)  The chart lists twenty-eight cases.  (*Id.*)  However, one case is listed as

"in progress," while two other cases were dismissed because the respondents were found

responsible and expelled for separate matters: therefore, the Court will look at the twenty-five

remaining cases to determine whether there is a pattern of gender bias in Defendants'

disciplinary history.

---

[65]      The Court notes that, at one point in the disciplinary process, Plaintiff changed his
advisor from a faculty member to his father.  (Dkt. No. 26, Attach. 4, at 4.)

Of the twenty-five remaining cases, there are three cases involving a male complainant, and in each case, Defendants decided to hold the respondent not responsible. This fact, however, is not evidence of gender bias, but only evidence of a statistically insignificant sample size. *See Doe v. Cummins,* 662 F. App'x 437, 454 (6th Cir. 2016) (applying Second Circuit *Yusuf* framework in the decision and holding that nine sexual misconduct cases is not a sufficient sample size); *see also Mayor of City of Philadelphia v. Educ. Equal. League,* 415 U.S. 605, 621 (1974) (finding no racial discrimination in composition of a public panel because panel only had thirteen members making it too small a sample to find discrimination based on its percentage of minorities); *Haskell v. Kaman Corp.,* 743 F.2d 113, 121 (2d Cir. 1984) ("The sample in the present case of ten terminations over an 11-year period is not statistically significant . . . .").

Plaintiff relies on *Doe v. Univ. of Denver*, 1 F.4th 822 (10th Cir. 2021), to support his argument that there is a sufficient sample size to show a pattern of gender bias. However, setting aside the non-binding nature of this case, Plaintiff's reliance on this case is ineffective because it involved the *investigation* of sexual misconduct cases, meaning that a male tried to file a sexual misconduct complaint and the college failed to even consider probing the facts, whereas the statistics Plaintiff relies on here involve the *adjudication* of such cases, meaning that Defendants accepted a filed complaint, probed the underlying facts, and ultimately concluded that the facts supported a finding of "not responsible." *Compare Doe v. Univ. of Denver*, 1 F.4th 822 at 835 *with* Dkt. No. 26, Attach. 24. Specifically, the court in *Univ. of Denver* found that there was a pattern of gender bias because the defendant failed to even consider investigating any of the twenty-one sexual misconduct cases brought by males over a three-year span. *Id.*

Here, according to the record before the Court, Defendants investigated and adjudicated every case in which a male was a complainant. (Dkt. No. 26, Attach. 24.) Moreover, a small

number of cases involving male complainants is not a function of gender bias because Defendants have no control over the gender makeup of the alleged Policy violators.  *See Cummins,* 662 F. App'x, at 453-54 ("[A]ppellants fail to eliminate the most obvious reasons for the disparity between male and female respondents in [the defendant's] sexual-misconduct cases: (1) [the defendant] has only received complaints of male-on-female sexual assault, and (2) males are less likely than females to report sexual assaults.") (internal quotations omitted); *see also King v. DePauw Univ.*, 14-cv-0070, 2014 WL 4197507, at \*10 (S.D. Ind. Aug. 22, 2014) ("[The defendant] is not responsible for the gender makeup of those who are accused by other students of sexual misconduct, and the fact that a vast majority of those accused were found liable might suggest a bias against accused students, but says nothing about gender.").

Finally, based on the record before the Court, although Defendants have never determined that a respondent was "responsible" in a complaint brought by a male, the Court notes that Defendants have determined, numerous times, that male-respondents were "not responsible" in complaints brought by females.  Specifically, of the twenty-two cases involving a male respondent and female complainant, only thirteen times (or 59% of the time) the male was found responsible, while nine times the male was found either not responsible or had the complaint against him formally withdrawn.  (Dkt. No. 26, Attach. 24.)

For all of the above reasons, the Court finds that there is no evidence of gender bias in Defendants' disciplinary decision against Plaintiff.  Accordingly, there is no genuine dispute of material fact with respect to Plaintiff's first and fourth causes of action, and the Court grants Defendants' motion for summary judgment and dismisses those claims.

**B.     Whether Plaintiff's Two Breach-of-Contract Claims Must Be Dismissed**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 26, Attach. 38 [Defs.' Mem. of Law]; Dkt. No. 38 [Defs.' Reply Mem. of Law].)  To those reasons (which are summarized above in Part I.C of this Decision and Order), the Court adds the following analysis, which is intended to supplement and not supplant those reasons.

"[W]hen a student is admitted to a school, an implied contract arises between the student and the school." *Dasrath v. Ross Univ. Sch. of Med.*, 494 F. App'x 177, 178 (2d Cir. 2012) (summary order) (citing *Clarke v. Trs. of Columbia Univ.*, 95-cv-10627, 1996 WL 609271, at *5 (S.D.N.Y. Oct. 23, 1996)).  "The terms of the implied contract are supplied by the bulletins, circulars and regulations made available to the student." *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998).  "Implicit in this contract is that the university must act in good faith in dealing with the student." *Gally v. Columbia Univ.*, 22 F. Supp. 2d at 206.

### 1.      Breach of the Policy

"'When a disciplinary dispute arises between a student and an institution, judicial review is limited to whether the institution acted arbitrarily or whether it substantially complied with its own rules and regulations.'" *Doe v. Colgate Univ.*, 15-CV-1069, 2017 WL 4990629, at *18, quoting *Routh v. Univ. of Rochester*, 981 F. Supp. 2d at 208.  "[G]eneral promises about ethical standards that are subject to neither quantification nor objective evaluation are far different from the types of specific promises which have led to valid breach of contract claims against universities." *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d at 370 (internal quotations omitted).  "'General statements of policy' or 'broad pronouncements of [a] university's compliance with existing anti-discrimination laws, promising equitable treatment of all students' cannot provide the basis for a breach of contract claim." *Rolph v. Hobart & William Smith*

*Colleges*, 271 F. Supp. 3d 386, 406 (W.D.N.Y. 2017) (citing *Ward v. N.Y. Univ.*, 99-cv-8733,

2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000)).  *See also Faiaz v. Colgate Univ.*, 64

F.Supp.3d 336, 359-60 (N.D.N.Y. 2014) (finding no breach of contract claim where the asserted

policy provision stated that "standards of consistency and equity [in disciplinary proceedings] are

maintained").  Indeed, "[c]ourts will only enforce terms that are 'specific and concrete.'"  *Posso

v. Niagara Univ.*, 518 F. Supp. 3d 688, 704 (W.D.N.Y. 2021) (citing *Knelman v. Middlebury

Coll.*, 898 F. Supp. 2d 697, 709 (D. Vt. 2012)).

      An alleged breach of "[g]eneral policy statements" and "broad and unspecified

procedures and guidelines" will not suffice" to state a claim.  *Nungesser v. Columbia Univ.*, 169

F. Supp. 3d, at 370 (internal quotations omitted).  "For example, a student who alleged that she

did not receive the field work supervision she was promised in her student handbook – including

a one-and-a-half to two-hour weekly supervision conference – stated a claim."  *Id.*

      For the reasons set forth below, the Court finds that Plaintiff's first, second, and third

contentions, which are listed above in Part I.C.2 of this Decision and Order, are without merit.

As to Plaintiff's fourth contention, the Court finds that, although there appears to be a genuine

dispute of material fact that Defendants breached the Policy and failed to appoint a properly

trained investigator, Plaintiff has not alleged facts plausibly suggesting this theory of liability in

support of this claim in his Complaint.  Further, even if he did make such an allegation, the Court

would decline to exercise supplemental jurisdiction over it.

           **a.**       **Fair Disciplinary Process**

      Plaintiff argues that Defendants breached their promise that he would "participate in a

process that is fair, timely, impartial, and provides adequate notice and a meaningful opportunity

to be heard."  (Dkt. No. 35, at 18 [citing the Policy].)  However, the provision of the Policy that

Plaintiff cites here is not a specific promise, but rather a general standard that is "subject to neither quantification nor objective evaluation." *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d at 370. Thus, to the extent that Plaintiff argues Defendants' violated the fairness provision of the Policy, he is mistaken. Regarding Plaintiff's arguments that Defendants' breached other portions of the Policy (*see* Part I.C.2 of this Decision and Order), the Court would add the following analysis.

### i.      Scope of Berryman's Duties

Regarding the transportation of Roe to her SANE Exam, although the Policy does not specifically provide that Berryman, the Title IX Coordinator, can provide transportation to sexual assault victims, it does generally provide that Hamilton College may assist victims with travel arrangements. (*See* Dkt. No. 26, Attach. 7, at 7 ["For individuals who seek initial medical treatment at the Health Center and decide to proceed with evidence collection, the individual may be escorted to Oneida Health by Campus Safety or may choose to travel by taxi (the College will provide a voucher) to any chosen medical provider."].)

Likewise, regarding Berryman's facilitation of a meeting between Roe and law enforcement, the Policy allows for the Title IX Coordinator to advise a victim about reporting to law enforcement. (Dkt. No. 26, Attach. 7, at 6 ["The Title IX Coordinator can also advise about options for reporting, including the option to report to local law enforcement, to initiate the on-campus resolution procedures, to do both, or to do neither."].) Moreover, the next sentence of the Policy states that the "Coordinator will provide guidance *and assistance* through the process of reporting on- and/or off-campus." (Dkt. No. 26, Attach 7, at 6 [emphasis added].) Furthermore, the Policy provides that "[t]he Title IX Coordinator or Campus Safety will assist

any Complainant who wishes to pursue a formal complaint with local law enforcement in making a report." (*Id.* at 7.)

Therefore, Plaintiff's argument fails because, not only has he not identified specific promises in the Policy that were breached, but the Policy does not clearly prohibit the Defendants' conduct, and in some cases the Policy seems to explicitly allow for it. *See Rolph v. Hobart & William Smith Colleges*, 271 F. Supp. 3d, at 407 (finding no deviation from a sexual harassment policy where the provision that the plaintiff asserted had been breached was not in the policy to begin with).

### ii.       Intent to Reach a Predetermined Result

Plaintiff cannot identify any specific provisions of the Policy that Defendants' investigators, Green and Kinne, breached.  Indeed, it is undisputed that the Policy gave investigators sole discretion to conduct investigations in the manner that they deemed appropriate.  (*See generally* Dkt. No. 38 [Defs.' Reply Mem. of Law; Dkt. No. 26, Attach. 7 [the Policy]; Statement of Fact No. 21 in Part I.B. of this Decision and Order.)  Thus, inconsistencies with regard to how prior investigations were conducted and whether to pursue specific pieces of evidence (such as the SANE exam results, or theories regarding the bruising on Roe's body) are not evidence of a breach of the Policy.  Finally, even if Plaintiff had identified specific provisions of the Policy, the record evidence is devoid of any genuine dispute of material fact that points to Green or Kinne conducting their investigation in a manner designed to reach any predetermined result, especially one where Plaintiff was to be found responsible of the Policy violations of which he was accused.

### iii.      References to Ongoing Criminal Investigation

By failing to redact portions of the Roe-Doe Investigation Report that contained references to an ongoing criminal investigation against him, Plaintiff argues that Defendants breached the Policy provision that provides, "*In general*, the Title IX Coordinator and the HSMB Chair *may* redact information that is irrelevant, more prejudicial to a party or witness than probative, an unwarranted invasion of an individual's privacy, otherwise violative of the policy, or immaterial."   (Dkt. No. 35, at 22 [Plf.'s Opp.'n Mem. of Law] [emphasis added]; Dkt. No. 26, Attach. 7, at 26 [the Policy].)   Plaintiff cites to two examples where the Roe-Doe Investigation Report mentions the criminal investigation, and both occurred in the transcript of Roe's interview with Green and Kinne.   (Dkt. No. 35, at 22.)   First, while explaining the timeline of events to investigators, Roe mentioned that law enforcement had custody of her rape kit (Dkt. No. 26, Attach. 41, at 36), and she then mentioned that she had met with law enforcement in the days after the assault (Dkt. No. 26, Attach. 41, at 38).   Second, Green explained to Roe that law enforcement did not automatically provide Hamilton College with access to police reports, and that, if she wished for the investigators to see those report, she needed to turn those reports over to Hamilton College.   (Dkt. No. 26, Attach. 42, at 26-27.)

Even assuming, as Plaintiff argues, that these brief mentions of the criminal investigation were more prejudicial than probative the failure to redact them was not a breach of the Policy. The Policy provision that Plaintiff argues Defendants breached was not a specific provision, but rather a general standard, "subject to neither quantification nor objective evaluation." *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d, at 370 (internal quotations omitted).   Moreover, even if Plaintiff did cite a specific provision, the Policy provision on redactions would not have been breached by Defendants, because the Policy first starts with the prefatory language, "[i]n general," and then states that the listed individuals "may" redact information.   (Dkt. No. 35, at 22

[Plf.'s Opp.'n Mem. of Law]; Dkt. No. 26, Attach. 7, at 26 [the Policy].)  The provision's language – aside from being indicative of a broad, non-specific promise – demonstrates that Defendants were under no obligation to redact the parts of the Roe-Doe Investigation Report, even assuming that doing so was more prejudicial than probative.  As provided by the Policy, all redactions, just like the investigative process, were discretionary in nature.

In any event, the Court notes that none of the voting HSMB Review Panel members were aware that Roe met with law enforcement, and it is not mentioned in the Panel's findings report; thus, the Court finds that the references were not prejudicial.  (Dkt. No. 38, at n. 8.)

### b.    Meaningful Access to Information and Evidence

Plaintiff argues that Defendants withheld meaningful access to information and evidence, and breached the Policy provision that provided that complainants and respondents had the right to "review all relevant documentary information available regarding the complaint and investigation, subject to the confidentiality limitations imposed by state and federal law and College policy, and the ability of the Title IX Coordinator and HSMB Chair to exercise discretion to redact or remove information deemed to be irrelevant, more prejudicial to a party or witness than probative, an unwarranted invasion of an individual's privacy or immaterial[.]" (Dkt. No. 26, Attach. 7, at 24.)

### i.    Surveillance Footage

Plaintiff's argument that Defendants' withheld surveillance footage and breached the above Policy provision is without merit, because it is undisputed that he eventually reviewed the footage.  Furthermore, even assuming the truth of the allegations that Plaintiff did not review the surveillance video footage with Green and Kinne on the date of his interview with them, and that instead the first time he reviewed the footage was in March 2020 (well after Roe), there is still no

genuine dispute of material facts regarding whether Defendants breached the Policy.[66]  Plaintiff

has not identified any specific provisions of the Policy that provided for the disclosure of

evidence within a certain period of time.  The Policy provided only a general right to review

evidence, subject to certain limitations.  (Dkt. No. 26, Attach. 7, at 24.)

In any event, the Court notes that the record evidence reflects that Plaintiff did not suffer

any significant prejudice from this delayed disclosure.  After reviewing the footage with

Berryman in March 2020, he could not articulate any specific questions or evidence he wanted to

pursue.  (Dkt. No. 26, Attach. 38, at 8.)  Moreover, the investigative phase of the process was

still ongoing, given that Defendants interviewed witness P.M. on Plaintiff's behalf after his

March 2020 meeting with Berryman.  (*Id.*)  These facts belie Plaintiff's argument that "[he] was

not able to utilize the video footage evidence in furtherance of his defense that Roe was not

incapacitated."  (Dkt. No. 35, at 25.)  Based on the current record, it appears that his questions, if

he had had any, would have been investigated.

### ii.    SANE Exam Results

Plaintiff argues that Defendants breached the Policy when they failed to obtain a copy of

Roe's SANE results.  (Dkt. No. 35, at 21-22.)  However, Plaintiff fails to acknowledge that the

SANE results were never within Defendants' custody; instead, the results were held by law

enforcement.  (Dkt. No. 38, at 8.)  Because the results were not held by Defendants and

contained within the record, Defendants could not have breached the Policy by failing to turn the

results over to Plaintiff.  Furthermore, Plaintiff has not cited any specific promise in the Policy

that states a respondent in a sexual misconduct complaint will have access to his accuser's

---

[66]    *See, supra*, note 37 of this Decision and Order for a discussion regarding whether
Plaintiff viewed the footage with Green and Kinne during his interview.

medical records.  Finally, the Court notes – as discussed above in Part III.B.1. of this Decision and Order – that the investigators had broad discretion to investigate the case in the manner that they deemed appropriate.  Thus, the decision to not obtain the SANE report under the circumstances fell within the investigators' sound discretion.

### iii.   Text Messages Between Roe and K.S.

Plaintiff argues that Defendants breached the Policy when Green and Kinne failed to disclose text messages between K.S. and Roe on the night of the assault.  (Dkt. No. 35, at 22.) From the record evidence, it appears that the text messages in question were not included in the Roe-Doe Investigation Report; thus, the HSMB Review Panel would not have viewed the messages either.  (*See generally* Dkt. No. 26, Attach. 46, at Tab 7 [interview of K.S.].)  After reviewing the interview with K.S., the Court finds that the text messages in question were likely related to a fake I.D. that K.S. and Roe were sharing that night.[67]  (Dkt. No. 26, Attach. 46, at 10.)  Plaintiff has not argued how the review of these text messages, whether by himself or the HSMB Review Panel, would have influenced the investigation and adjudication of his case. Indeed, Plaintiff would have known about the missing text messages when he reviewed the draft report and prepared for his appeal, but he never inquired about the missing messages during either process.  (Dkt. No. 38, at 12.)  Moreover, he fails to realize that the Policy provision pertains only to relevant information, subject to certain restrictions.  Indeed, the Appeal Board found that the missing messages had no impact on the outcome of the disciplinary process.  (Dkt.

---

[67]     Although the text messages are missing from the record, the record contains the portion of K.S.'s interview where she reads parts of her messages to investigators.  Moreover, the record contains the portion of K.S.'s interview where she sends screenshots of those messages to Green.

No. 26, Attach. 22, at 2.)  Given that Plaintiff fails to argue how the messages were relevant, there cannot be a breach of the provision.[68]

Finally, the Court has carefully considered the record evidence, and it finds that Defendants "substantially complied with its own rules and regulations."  *Routh v. Univ. of Rochester*, 981 F. Supp. 2d at 208.  The amount of evidence in Plaintiff's disciplinary case is voluminous, and the record reflects that Defendants made a substantial effort to comply with the Policy and provide the full record to him, while also balancing Roe's rights under the Policy and logistical issues caused by the need to close the campus and shift to remote operations.

### iv.    Roe's Review of Her Transcript Before Plaintiff

Plaintiff argues that the delay between when Roe reviewed her transcript and when he reviewed his transcript breached the Policy.  (Dkt. No. 35, at 22-23.)  As an initial matter, it is unclear to the Court what specific provision of the Policy Plaintiff is arguing that Defendants breached.  It cannot be the provision regarding his right to review all relevant evidence, because he did get the chance to review his transcript.[69]  Nevertheless, even assuming that Plaintiff was citing a specific Policy provision, there are legitimate reasons why there was a delay between each party's review of the transcript, such as ensuring that Roe and Plaintiff did not interact with each other, and the fact of the Thanksgiving holiday school break.[70]  (Dkt. No. 26, Attach 6, at 24 [Dec. of Berryman].)

---

[68]    Indeed, it would have been within Defendants' rights under the Policy to withhold irrelevant information.

[69]    In addition, because he was the subject of the interview, he would have known of the transcript's contents even before he reviewed it.

[70]    The Court notes that, at her interview with Green and Kinne, Roe was negatively affected when she saw Plaintiff in the parking lot of the interview building.  (Dkt. No. 26, Attach. 42, at 29.)

####      c.      Opportunity to Pose Question to Witnesses

Plaintiff argues that Defendants did not disclose the identities of seventeen of the twenty-four witnesses in his case, and thus he could not review their interview transcripts, until March 2020.  Therefore, he argues that Defendants' breached the Policy provision that provides, "The Complainant and Respondent will be invited to offer and/or identify all information they would like the Investigation Team to review, and both may recommend witnesses and submit information for consideration, including proposed questions to be posed by the Investigation Team to witnesses."  (Dkt. No. 26, Attach. 7, at 26.)

Based on the current record, no reasonable jury could find that Plaintiff was deprived of the ability to question witnesses.  As an initial matter, the Policy provision he cites does not provide a timeframe for Defendants to disclose witness transcripts, and Plaintiff cites no other specific Policy provisions that Defendants purportedly violated.  In any event, Plaintiff admits that he reviewed the transcripts in March 2020, and the Court has already concluded (*see*, *supra*, Part III.B.1.b.i of this Decision and Order) that the investigation was ongoing in March 2020, even after the issuance of the draft report.[71]  As a result, even if Plaintiff had articulated questions to Berryman in March 2020 (despite the fact that Plaintiff admits he could not articulate any questions to Berryman at that time [Dkt. No. 26, Attach. 38, at 8, 12]), no admissible record evidence exists that those questions would *not* have been posed to the witnesses, as part of Defendant's ongoing investigation.  In other words, nothing in the record evidence indicates that Plaintiff had his efforts impeded.  In short, although Plaintiff was not allowed to question witnesses in the manner that he preferred, he was never entitled under the Policy to question witnesses in his preferred manner.  Furthermore, the manner that Defendants

---

[71]      Investigators interviewed witness P.M. on behalf of Plaintiff.

allowed him to question witnesses did not violate the Policy.  *See Doe v. Colgate Univ.,* 15-CV-
1069, 2017 WL 4990629, at *22 (finding no breach of contract where the plaintiff argued that he
had inadequate time to prepare for his hearing and was denied a reasonable opportunity to
present facts and arguments and question witnesses but the record evidence did not show such
conduct); *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d, at 465 (finding no gender bias or
breach of contract where a plaintiff had his line of questioning during a college disciplinary
hearing cut short by a college administrator who deemed the questions redundant).

### d.      Appointment of a Trained Investigator

Plaintiff argues that Defendants breached the Policy by failing to appoint a properly
trained investigator.  (Dkt. No. 35, at 24-25.)  The Policy provision at issue states, "in cases
involving a Non-consensual Sexual Act, so long as at least one qualified HSMB member is
available, the investigation team will include an HSMB member, and an external investigator."
(Dkt. No. 26, Attach. 7, at 16.)  It is undisputed that one of the charges against Plaintiff involved
a non-consensual act.  *See* Statement of Fact No. 130 in Part I.B. of this Decision and Order.
Thus, the Policy provision that Plaintiff cites applied here.  Defendants cite a Policy provision
that states, in relevant part, that "The Investigation team will normally be comprised of members
of the HSMB . . . , but the Title IX Coordinator may decide to use one of more appropriately
trained College employees . . . ."  (Dkt. No. 38, at 13.)  Thus, Defendants' argue, there was no
requirement that investigators be HSMB members.  (*Id.*)  However, Defendants are mistaken: the
specific provision in the Policy that Plaintiff cites controls.  This was not a normal misconduct
case, but rather one involving a non-consensual sexual act.  Therefore, the specific provision that
starts with, "in cases involving a Non-consensual Sexual Act," controls here.

The record reflects that there were nine members of the HSMB Board.  (Dkt. No. 35, Attach. 29.)  The record also reflects that Berryman asked two members of the HSMB Board to serve as investigators.  (Dkt. No. 38, at 10.)  Orvis, Rosenstein, Cockburn, and Harrison were chosen to be on the HSMB Panel that heard Plaintiff's case.  Therefore, of the nine Board members, six either served on the Panel or (for either scheduling or conflict-of-interest reasons) could not serve as investigators.  That leaves three Board members who could have served as an investigator; but the record does not reflect that Berryman found those three unavailable.  Thus, there appears to exist a genuine dispute of material fact regarding whether Defendants' breached the Policy.  More specifically, according to the Policy, during the investigation of a non-consensual sexual act, Berryman could only have chosen a non-HSMB Board member as an investigator if *none* were available.  However, here, based on the record evidence, it is unclear whether none of the HSMB members could have served as an investigator in Plaintiff's case.

That being said, even liberally construed, Plaintiff's Complaint does not expressly claim, or allege facts plausibly suggesting, that the investigators on his case were improperly trained, or that Kinne should not have served as an investigator because he was not an HSMB member. (*See generally* Dkt. No. 1.)  Moreover, even if Plaintiff did make such a claim or allegation in his Complaint, the Court would decline to exercise supplemental jurisdiction over it under the circumstances.  Thus, the Court will dismiss this narrow aspect of Plaintiff's breach-of-contract claim only without prejudice to refiling in state court within the applicable limitations period.

### 2.      Breach of the Covenant of Good Faith and Fair Dealing

Plaintiff's other breach of contract claim (his third claim), which is that Defendants breached their duties of good faith, fair dealing, and to avoid making arbitrary and capricious decisions, is duplicative of his previously discussed breach-of-contract claim (his second claim),

which is that Defendants breached their agreement under the Policy.  Under New York law, "a 'breach of the implied covenant of good faith and fair dealing claim that is duplicative of a breach of contract claims must be dismissed.'"  *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d at 482, quoting *MBIA Ins. Co. v. GMAC Mortg. LLC*, 914 N.Y.S.2d 604, 611 (N.Y. Sup. Ct. 2010); *see also ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997) ("A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.") [internal quotations omitted]; *Doe #1 v. Syracuse Univ.*, 468 F. Supp. 3d 489, 509 (N.D.N.Y. 2020) ("Since Plaintiffs' allegations regarding their quasi-suspension and transcripts also underpinned their breach of contract claims, their claim for breach of the implied covenant of good faith and fair dealing must be dismissed.") (citing cases).

Finally, in his memorandum of law in opposition to Defendants' motion, Plaintiff fails to specifically address this claim, and he fails to make any arguments in further support of it.  *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."); *Doe v. Colgate Univ.,* 15-CV-1069, 2017 WL 4990629, at *24 (dismissing a claim of breach of covenant of good faith and fair dealing where the plaintiff failed to develop his arguments aside from conclusory statements).  In any event, for the reasons stated earlier, the Court finds that, based on the current record, there exists no genuine dispute of material fact regarding whether Defendants breached the implied covenant of good faith and fair dealing or made any arbitrary or capricious decisions: they did not.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 26) is

**GRANTED**.

**ORDERED** that Plaintiff's claims pursuant to Title IX and the NYSHRL are

**DISMISSED** **with prejudice**;

**ORDERED** that Plaintiff's breach-of-contract claims are **DISMISSED** **with prejudice**,

**EXCEPT** for his breach-of-contract claim with respect to the appointment of an improperly

trained investigator, which is **DISMISSED** **without prejudice** to refiling in state court within

the applicable limitations period.

Dated: December 19, 2023
        Syracuse, NY

Glenn T. Suddaby
U.S. District Judge